**UNITED STATES of America, Appellee,**

v.

**Jose CRESPO, Appellant.**

**No. 188, Docket 87–1204.**

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1987.

Decided Nov. 25, 1987.

Joseph I. Stone, New York City, David A. Elden, Los Angeles, Cal., for appellant.

Charles W. Gerber, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Emily Berger, Asst. U.S. Atty., of counsel), for appellee.

Before LUMBARD, OAKES, and KEARSE, Circuit Judges.

OAKES, Circuit Judge:

Jose Crespo appeals from a judgment of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Chief Judge, convicting him after a jury trial of one count of conspiracy to possess cocaine with intent to distribute it, 21 U.S.C. §§ 841(b)(1)(B), 846 (1982), one count of possession of cocaine with intent to distribute it, 21 U.S.C. § 841(a)(1), (b)(1)(B) (1982), and two counts of intimidating and threatening a person to hinder and prevent communication of information relating to a crime to federal law enforcement officers in violation of 18 U.S.C. § 1512(a)(3) (1982). Crespo was sentenced to four concurrent ten-year terms of imprisonment and also sentenced to special parole for life on the possession count. Appeal is from the denial of a pretrial motion to suppress more than five pounds of cocaine, money, and certain drug-related paraphernalia seized from a closet in appellant's apartment in Queens. Crespo challenges the validity of his warrantless arrest, and contends that because his consent to the search was the result of an illegal arrest, it was neither knowing nor voluntary. We affirm.

## FACTS

As testified to at the suppression hearing and found by the trial judge who denied appellant's motion, Maria Polkowski was working as an informant for the United States Drug Enforcement Administration ("DEA") in February, 1986, when appellant Jose Crespo and his brother Gerardo made arrangements to sell her three kilograms of cocaine. The sale did not go through. In July and again in late September, 1986,

Jose Crespo and his brother, having become aware that Polkowski worked as an informant, threatened her and her children at gunpoint. At this time Polkowski knew neither Crespo's address nor even his last name. After the September threat she discovered that Crespo—whom she knew only as "Jose"—lived on the second floor of an apartment building located at 85–05 35th Avenue, Queens, New York.

About 6:00 p.m. on October 1, 1986, four DEA special agents, Spanish-speaking Agent Garcia and Agents Hunt, Geisel, and Grabowski, accompanied the informant Polkowski to the Queens address. Garcia instructed her to knock on all of the doors on the second floor and, if "Jose" answered the door, to ask him why he had been threatening her. The agents concealed themselves on the stairwells and around the corner of the hallway some twenty-five to thirty feet from the door of what they later learned was Crespo's apartment.

When Polkowski knocked on the third door, Jose Crespo appeared. Polkowski asked him, "Why are you threatening me? I want you to stop threatening me." In Crespo's response in Spanish, overheard and understood by Agent Garcia, he mentioned the word "killers," and then said, "I have nothing to do with you, but my people will deal with you." As the trial court found, this was a clear threat, if not of immediate physical violence, then of violence in the very near future. At that point the agents had reason to believe that a crime had been committed within their presence under what the trial court termed a "variety of state provisions and probably under 18 U.S.C. § 1512." The federal statute prohibits, inter alia, tampering with a witness or an informant by intentional harassment or threat to dissuade the person from reporting matters to law enforcement officers.[1] The trial judge found that

upon hearing the threats, the agents had the immediate right to arrest Crespo.

As the agents approached, Crespo either slammed the door shut when he saw them or already had closed the door and retreated into his apartment. The agents then knocked on the door and identified themselves as police. Although the agents claimed they merely had their hands on their holstered guns, the court credited the testimony of appellant and his wife, Diana Jiminez, that looking through the peephole in the door, they saw guns in the agents' hands. The court found that this display of weapons, together with the agents' kicking the door, caused the door to be opened by threat of force and not with consent. Nonetheless, because the officers had the immediate right to arrest Crespo, the court held they also had the right to follow him in hot pursuit into the apartment. To have required the agents to get a warrant under the circumstances, particularly where there was a possibility of Crespo's escaping, would have been, the court found, unreasonable.

Once the agents entered the apartment (it is unclear whether Crespo or Jiminez opened the door), Crespo was arrested, handcuffed and given *Miranda* warnings. Shortly after the agents' entry, Polkowski, followed closely by Jose's brother Gerardo, also came into the apartment. Polkowski then identified Gerardo as the other man who had threatened her and her children, at which point the agents arrested him and advised him of his rights.

The agents next asked Jose Crespo whether he had any guns in the apartment. The trial court found that, following his denial, Crespo voluntarily and in full control of his faculties consented to a search of the premises, as did Jiminez. Within a minute or so, Special Agent Geisel discover-

---

1. 18 U.S.C. § 1512(a)(3) provided at the time of the entry:

> (a) Whoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> . . . .

> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

ed a black nylon bag on the top shelf of the living room closet. When opened, the bag was found to contain five and one-half pounds of cocaine, $1,800 in cash, numerous plastic bags, a triple-beam balance scale, and a white pad containing drug records. The agents next searched Jiminez's pocketbook and found in it twenty-eight grams of cocaine, whereupon the agents arrested Jiminez and read her *Miranda* warnings. Crespo immediately claimed all of the cocaine as his own, and protested his wife's innocence.

The court below took care to explain how a finding that Crespo and Jiminez voluntarily consented to a search of the apartment was not inconsistent with the previous finding that they had not given consent for the agents to enter the apartment. The trial judge considered Crespo's demeanor, noting his arrogance and self-assurance, and found it was quite likely that Crespo believed the agents would not find the materials hidden in the closet.

## DISCUSSION

The Government argues that Crespo's arrest was actually set in motion in a public place, and accordingly, the agents were permitted to enter his apartment in hot pursuit under *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). Unlike the Supreme Court's finding that Santana's standing in her doorway "exposed [her] to public view, speech, hearing, and touch as if she had been standing completely outside her house," 427 U.S. at 42, 96 S.Ct. at 2409, here we have no precise finding as to Crespo's position when he spoke to the informant Polkowski. For all that appears, the door to the apartment was at most half-opened and, indeed, even that degree of exposure was induced by the DEA agents who were seeking to flush Crespo out. We agree in substance with *State v. Morse*, 125 N.H. 403, 480 A.2d 183 (1984), that *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), would apply under such circumstances so as to prohibit the entry into the home.

■ But we also hold, as did the district court, that this court's decision in *United*

*States v. Martinez–Gonzales*, 686 F.2d 93, 100–02 (2d Cir.1982), applies. There we noted that even under *Payton*, entry into a home to make an arrest on probable cause may be justified where exigent circumstances exist. *See also United States v. Reed*, 572 F.2d 412, 424 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed. 2d 259 (1978). We also there reaffirmed our adoption of factors enumerated by the District of Columbia Circuit Court of Appeals in *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C.Cir.1970), as useful guides to determining whether exigent circumstances are present:

> These include (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*Martinez–Gonzalez*, 686 F.2d at 100 (quoting *Reed*, 572 F.2d at 424). The presence or absence of any one factor is not conclusive; rather, the essential question is whether there was "urgent need" that "justif[ied]" the warrantless entry. *Dorman*, 435 F.2d at 391, *quoted in Martinez–Gonzalez*, 686 F.2d at 100; *see also United States v. Martino*, 664 F.2d 860, 878–80 (2d Cir.1981) (Oakes, J., concurring), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). Here, Crespo's use of the word "killers," when coupled with informant Polkowski's reports of Jose's and Gerardo's previous threats at gunpoint, satisfied the first three factors mentioned above. Intimidation of a federal informant is a serious offense, *see* 18 U.S.C. § 1512(a)(3) (1982), subjecting an offender to a fine of not more than $250,000 or imprisonment of not more than ten years, or both. Moreover, Crespo's prior use of guns made it reasonable to believe he was either armed when he answered Polkowski's knock, or that he would arm himself

immediately upon retreating into his apartment. As to the third factor, because he committed the crime in their presence, the agents had probable cause to arrest Crespo. And, since they had observed his retreat, the agents could be virtually certain that Crespo was in the premises being entered. Finally, the district court found that there was a significant danger of Crespo's escaping if not immediately apprehended. Even though an agent had been sent to cover the back of the building, there was reason to believe that he alone could not have prevented Crespo's escape, particularly if, as the trial court noted, "the brother was there and they were equipped with shotguns and pistols," as they had been when they previously threatened Polkowski. We often have taken judicial notice that, to substantial dealers in narcotics, firearms are as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia. *Martinez–Gonzalez*, 686 F.2d at 101 (quoting *United States v. Oates*, 560 F.2d 45, 62 (2d Cir.1977) (quoting *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976))).

It is true that in *Martinez–Gonzales* the *Santana* hot pursuit rationale supported the Government's entry into the apartment, 686 F.2d at 101–02, although here we do not rely on that theory. But we take it, as did Judge Leventhal in *Dorman*, 435 F.2d at 391, that the "term [hot pursuit] is not a limitation but rather an illustration of the kind of exigent circumstance justifying entry without a warrant to arrest a suspect." *See also Martinez–Gonzales*, 686 F.2d at 102. Here, while there was technically no flight from a public to a private place so as to bring *Santana* into play, there was a crime committed in the presence of the agents, together with other distinct exigencies.

First, while this apartment—unlike that in *Martinez–Gonzales*—was not known as a stash-pad, the agents could well have considered that the probabilities of finding narcotics there were substantial. Having identified themselves to Crespo as police officers, the agents could then reasonably conclude that evidence might be destroyed if they did not enter the apartment swiftly. *See United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981). Indeed, the likelihood that evidence would be destroyed was increased just by Polkowski's appearance at the apartment. Crespo already believed Polkowski to be a federal informant; her arrival at his door confirmed the discovery of both his identity and his address, information which Crespo logically could assume would be passed on immediately to the Government. Although we would be hesitant to hold that exigent circumstances sufficient to justify a warrantless arrest in the home exist whenever law enforcement officials make a narcotics suspect aware of their presence and intent to enter that home, our conclusion here is supported by more compelling evidence of the urgent need to make such an arrest.

The agents were aware that they were exposing Polkowski to considerable danger in using her to discover where Crespo lived. Against the background of the earlier reports of armed threats, the threat overheard by the agents made it reasonable to conclude that both the informant and the agents themselves would be subjected to an unacceptable degree of risk if Crespo were not arrested on the spot. Besides affording Crespo an opportunity to arm himself more heavily, any delay in apprehending Crespo could have allowed him to signal his brother or his purported "people"—any of whom might have been inside the apartment at the time—to come to his aid, or even to carry out the death threat against Polkowski's children.

The district court's factual findings preclude Crespo's arguments concerning the voluntariness of his consent to search the apartment. That Crespo was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *Gomez*, 633 F.2d at 1008. Nor under *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), does the Government have an affirmative duty to advise a

272

suspect that he may refuse his consent to an apartment search. Giving the district court's findings the requisite deference, we affirm. While Crespo argues that any consent given was obviously a reaction to the officers' display of authority, we must view the evidence in the light most favorable to the Government, *United States v. Ceballos*, 812 F.2d 42, 51 (2d Cir.1987). Viewed in that light, we cannot say that the findings are clearly erroneous. *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984). On this point, we cannot disregard the trial judge's findings that "having observed Jose Crespo, I believe he is arrogant and self-assured and that it is quite likely that he believed that the agents would not find the materials which were in a closet on a shelf hidden in a bag." There were also findings to the effect that Crespo was a "highly intelligent person and a professional in the trade," who, therefore, would realize that failure to give consent would merely delay the search for an hour or so. The district court also found that Jiminez consented "not because of a fear of the agents, but rather because her husband had in fact already consented."

Judgment affirmed.