UNITED STATES of America, Appellee,

v.

Paul THOMAS and Errol MacDonald,
Defendants–Appellants.

Nos. 236, 277, Dockets 89–1262, 89–1263.

United States Court of Appeals,
Second Circuit.

Argued Oct. 26, 1989.

Decided Jan. 8, 1990.

Stephen Fishbein, Asst. U.S. Atty. (Benito Romano, U.S. Atty. for the S.D.N.Y., Mary Lee Warren, Asst. U.S. Atty., New York City, on the brief), for appellee.

Murray Cutler, Brooklyn, N.Y., for defendant-appellant Paul Thomas.

Noah Lipman, New York City, for defendant-appellant Errol MacDonald.

Before OAKES, Chief Judge,
KEARSE and ALTIMARI, Circuit
Judges.

KEARSE, Circuit Judge:

Defendants Paul Thomas and Errol MacDonald appeal from final judgments entered in the United States District Court for the Southern District of New York after a jury trial before Robert J. Ward, *Judge*, convicting each of them on one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 812 and 841(b)(1)(C) (1982 & Supp. V 1987), *id.* § 841(a)(1) (1982), and 18 U.S.C. § 2 (1982); and one count of using or carrying a fire-

arm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (1982 & Supp. V 1987) and *id.* § 2. Thomas was sentenced principally to consecutive prison terms of 63 months and five years on the possession and weapon counts, respectively, to be followed by five years' supervised release. MacDonald was sentenced principally to consecutive prison terms of 51 months and five years on the possession and weapon counts, respectively, to be followed by five years' supervised release. On appeal, Thomas contends that he is entitled to a new trial because of an error with respect to the jury charge. MacDonald contends principally that evidence against him should have been suppressed because it was seized in violation of his rights under the Fourth Amendment to the Constitution. We conclude that the latter contention may have merit, and we remand to the district court for further proceedings with respect to MacDonald. We affirm the conviction of Thomas.

## I. BACKGROUND

The trial evidence leading to defendants' convictions may be summarized briefly. Taken in the light most favorable to the government, it showed the following.

On the evening of September 8, 1988, members of the New York Drug Enforcement Task Force ("Task Force"), acting on information received from a confidential informant, conducted a surveillance of apartment 1-O at 321 Edgecombe Avenue in Manhattan ("321 Edgecombe"). The agents observed a steady succession of cars, many of them with out-of-state license plates, arrive, pause while passengers briefly visited apartment 1-O, and then depart. One of the emerging passengers placed something under the gas cap of his car before departing. The occupants of another car informed the agents that narcotics were being sold in apartment 1-O.

At 9:40 p.m., James Agee, a United States Drug Enforcement Administration special agent assigned to the Task Force, sought to make an undercover buy of narcotics in apartment 1-O. He entered 321 Edgecombe, knocked on the door of the apartment, and was admitted. Inside the apartment, which was well lit, Agee saw six men, including Thomas and MacDonald. Thomas was seated to Agee's right holding a cocked nine millimeter pistol; the pistol was pointed downward but in Agee's direction. MacDonald was seated on a couch, counting a large amount of cash. One or two feet away from the couch was a television set with a .357 magnum revolver on it; the .357 was within the reach of MacDonald.

Agee also saw marijuana on a couch and bags of marijuana and cocaine on a table. He requested $5 worth of marijuana. One of the other men handed him a bag of marijuana; Agee paid him with a $5 bill whose number had been prerecorded by the Task Force. Agee then left; he had been in the apartment for two or three minutes.

About 10 minutes later, seven members of the Task Force forcibly entered apartment 1-O. They found five of the men Agee had seen there earlier, including Thomas and MacDonald. The five were arrested, and Thomas and MacDonald were indicted on the charges described above. From the apartment, the agents seized marijuana, cocaine, the two guns, and various narcotics paraphernalia.

### A. *The Denial of MacDonald's Motion To Suppress*

Prior to trial, MacDonald moved to suppress the evidence seized by the Task Force agents from apartment 1-O on the ground that the warrantless entry into the apartment violated his rights under the Fourth Amendment. The government opposed the motion, contending that MacDonald had no standing and that, in any event, the entry was warranted by exigent circumstances. At an evidentiary hearing, the proof included the following.

#### 1. *MacDonald's Standing*

When arrested, MacDonald had in his possession a key to the front door at 321 Edgecombe and a key to apartment 1-O. The tenant of apartment 1-O was one Winston Watson, and the utilities for the apartment were in his name. MacDonald testi-

fied that since May 1988, Watson, a/k/a "Sammy," had allowed him to use the apartment for assignations with a girlfriend. MacDonald had been in the apartment 5–10 times and had slept there overnight three or four times on a pull-out couch. He kept there soap, a toothbrush, and "maybe some clothes." MacDonald gave Sammy $40–50 each month toward the rent, which was more than $200 a month, and paid for collect telephone calls he received there.

Sammy owned everything in the apartment, including the narcotics and the firearms. MacDonald had on occasion kept up to two pounds of marijuana there; he sold or gave smaller quantities to others, though he did not distribute from that location.

Sammy gave MacDonald keys to the apartment whenever MacDonald planned to sleep there. On September 8, MacDonald expected to meet his girlfriend in the apartment at about 11 p.m. and had arrived early in order to get the keys from Sammy. He did not know two of the men who were there when he arrived, and Sammy did not introduce them; but MacDonald assumed that they would leave before his girlfriend arrived.

Agent Agee testified on the subject of MacDonald's standing as follows. The apartment had only one closet; there were no clothes in it. In the kitchen area there was a refrigerator; it had nothing in it but an ice tray. There was a stove; but there were no pots or other cooking utensils. In the bathroom, there were no toothbrushes, razors, or other toiletries. In the living room there were two love seats; but there was no pull-out couch.

### 2. Exigent Circumstances

With respect to the government's contention that exigent circumstances justified the warrantless entry, Agee testified as follows.

In May 1988, a confidential informant told Task Force agents that she had recently visited apartment 1–O at 321 Edgecombe and spent several hours there. She had observed that narcotics, including marijuana and cocaine, were being stored there. In addition, she was taken to a third floor apartment in the building, in which more narcotics were stored. The informant had provided reliable information in the past. Based on her May 1988 statements, six Task Force agents commenced surveillance of 321 Edgecombe on the evening of September 8, 1988.

During the course of this surveillance, the agents observed a succession of cars, many with out-of-state license plates, drive up to the building, double park, and wait as passengers entered the building and then returned a short time later. Between 6:50 p.m. and 9:40 p.m., some 15 to 20 persons entered and exited 321 Edgecombe in this fashion. Agee followed several of them into the building and observed them enter apartment 1–O. One person who exited the building after a brief visit placed something inside the gas cap of his car before driving off.

At about 9:30 p.m., the agents followed one car upon its departure and stopped it several blocks away, out of the range of vision from 321 Edgecombe. The occupants of this car told the agents that narcotics were being sold in apartment 1–O and that sales were not being limited to regular customers. Following this conversation, Agee telephoned his supervisor at the Task Force's Manhattan office, and it was decided that Agee would go to apartment 1–O to make a controlled purchase of marijuana using prerecorded money.

At about 9:50 p.m., Agee, followed at a distance by another agent, entered the building through its front door, whose lock was broken. Agee knocked at the apartment door and was admitted. He observed that the apartment consisted of two rooms: a living room with a kitchen area, and a bathroom. Each room had one window; the windows faced Edgecombe Avenue. The only door to the apartment was its front door.

As at trial, Agee testified that there were six men inside, including Thomas pointing the cocked nine millimeter pistol in Agee's direction, and MacDonald counting

cash on a couch within reach of the .357 magnum revolver. Agee further testified that he smelled marijuana burning in the apartment and that he saw bags of what appeared to be marijuana and cocaine on a table. Agee purchased a bag of marijuana for $5 and left. He did not see the agent who had shadowed him into the building.

Agee then, with his supervisor who had arrived on the scene accompanied by six additional agents, formulated a plan for an agent to go to apartment 1–O to talk with the person who had sold Agee the marijuana and to ask for consent to search the premises. No effort was made to contact an Assistant United States Attorney to obtain a search warrant; nor did the agents discuss the possibility of obtaining a warrant.

At approximately 10 p.m., Agee returned to apartment 1–O with six other agents. The supervisor and the other agents remained outside. With guns drawn, Agee's group knocked on the door of the apartment and identified themselves as police officers. They received no response but heard sounds of movement and shuffling of feet; they then received a radio communication from the supervisor that the occupants of the apartment were attempting to escape through the windows. Agee's group of agents promptly broke in the apartment door with a battering ram they had with them.

The agents found five men in the apartment; Sammy, who had sold the marijuana to Agee, had left. The agents arrested all five and seized physical evidence, including the nine millimeter pistol, the .357 magnum revolver, 443 grams of cocaine, approximately four and one-half kilograms of marijuana, a scale, a grinder, various packaging materials, and large amounts of cash.

Agee testified that he was familiar with the process of obtaining a search warrant by telephone and had done it twice in the past but that the process took at least two hours. He said that on the night of September 8 the agents had feared that before they could get a warrant the evidence would be sold, or destroyed, or moved with-in the building to another apartment that they had not yet identified.

Agee testified that the stream of visitors to 321 Edgecombe included Whites, Blacks, and Hispanics, and that the Task Force likewise included some of each ethnic group. The surveilling agents used unmarked cars designed to blend in with the civilian cars in the area. Agee's car was double-parked among a number of other double-parked cars; he did not know where the other agents' cars were. The building comprised more than 50 ("closer to a hundred") apartments, and there was a good deal of traffic in and out of the building.

Agee had not recognized any of the men in apartment 1–O when he made his undercover purchase, and no one in the apartment knew who he was. He did not hear any conversation with respect to security or observe any countersurveillance devices in the apartment.

3. *The District Court's Decision*

Following the suppression hearing, the court stated that it "w[ould] assume that defendant McDonald [*sic*] has standing although the matter is not free from doubt." On the assumption that MacDonald had established standing, the court determined that the motion to suppress should be denied because the government had shown that the warrantless entry was justified by exigent circumstances. The court stated, in pertinent part, as follows:

> The offenses involved, trafficking in narcotics and possession of firearms are most serious offenses often involving violence. Presence of the narcotics and the weapons under the circumstances suggested that the defendants were engaged in ongoing criminal activities and were in a position to use the weapons thereby creating an emergency situation justifying immediate entry.
>
> Additionally, the defendants [*sic*] had urgent need to make a warrantless entry in order to prevent the destruction or loss of evidence as well as to prevent the flight of the suspects. Based on Agent Agee's observations the apartment contained narcotics, cash, and other narcot-

ics paraphernalia. In addition, the agents had been told by a confidential informant that the suspects control [*sic*] at least one other apartment in the building.

Therefore, it would have been a relatively simple matter, while the agents waited outside the building for a search warrant, for the suspects to transfer quantities of contraband from one apartment to another.

Accordingly, the agents had reason to immediately secure apartment 1O [*sic*].

Moreover, once the agents had knocked on the door and identified themselves, and the door was not opened, any delay in arresting the suspects would be likely to result in the destruction of evidence, particularly the cocaine, which could be disposed of easily, by being flushed down the bathroom toilet.

There are several additional circumstances to support the agents' reasonable belief that they could not afford to wait until a warrant had been obtained. The events in question occurred at approximately 10:00 p.m. in the evening, a time at which obtaining a warrant would have taken a matter of hours, thereby increasing the risk that evidence would be lost or destroyed.

### B. *The Verdicts*

The trial evidence thus included the narcotics, guns, and narcotics paraphernalia seized from the apartment. The jury found both Thomas and MacDonald guilty of possession of cocaine with intent to distribute and of using or carrying a firearm during the course of that offense. They were sentenced as indicated above, and these appeals followed.

### II.  DISCUSSION

On appeal, MacDonald contends that (1) the district court erred in denying his motion to suppress the evidence seized as a result of the warrantless entry into apartment 1-O, and (2) the evidence was insufficient to establish that he carried or possessed any of the guns in the apartment. Thomas contends that the trial court erred

in refusing to give an instruction he requested with respect to the evidence identifying him as the holder of the nine millimeter pistol.  We find no merit in Thomas's contention, but we conclude that further findings are required with respect to MacDonald's motion to suppress.

### A.  *Exigent Circumstances*

It is a basic principle of Fourth Amendment law that, in the absence of consent, " 'a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show ... the presence of "exigent circumstances." ' "  *Welsh v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971)).  "[T]he burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries," *Welsh v. Wisconsin,* 466 U.S. at 750, 104 S.Ct. at 2097–98, and its burden is a heavy one.

The Supreme Court has found the burden of establishing exigent circumstances satisfied where the law enforcement officers have been in pursuit of a fleeing felon whose arrest was first attempted in public, *see United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976), and where the officers reasonably believed the destruction of critical evidence was imminent, *see Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966).  This Court has ruled warrantless entries and their ensuing searches and arrests lawful in similar circumstances, *see, e.g., United States v. Martinez-Gonzalez,* 686 F.2d 93, 100–02 (2d Cir.1982) (pursuit of fleeing felon); *United States v. Zabare,* 871 F.2d 282, 291 (2d Cir.) (likely destruction of evidence), *cert. denied,* —— U.S. ——, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989); *United States v. Gallo-Roman,* 816 F.2d 76, 79 (2d Cir. 1987) (same); *United States v. Vasquez,* 638 F.2d 507, 531–32 (2d Cir.1980) (same), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70

L.Ed.2d 396 (1981); *United States v. Cattouse*, 846 F.2d 144, 147 (2d Cir.) (same), *cert. denied*, —— U.S. ——, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988), or where there was a reasonable probability that the arrest of one robber would alert the others and lead to flight, concealment of evidence, or an increased risk of armed confrontation, *see United States v. Campbell*, 581 F.2d 22, 26 (2d Cir.1978), or where the events had created a considerable danger to the informant, her family, and law enforcement officers, *see United States v. Crespo*, 834 F.2d 267, 271 (2d Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988); *see also United States v. Zabare*, 871 F.2d at 289.

In any determination of whether there were exigent circumstances sufficient to justify a warrantless entry, the fundamental question is whether the law enforcement officers had reason to believe there was an urgent need that justified such an entry. We have generally begun our review of this question by stating that the pertinent factors

> include (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause … to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. Reed*, 572 F.2d 412, 424 (2d Cir.) (quoting *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C.Cir.1970) (en banc)), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *United States v. Crespo*, 834 F.2d at 270; *United States v. Martinez–Gonzalez*, 686 F.2d at 100; *United States v. Campbell*, 581 F.2d at 26. We have made clear that this list of factors "is illustrative, not exclusive; other factors may be relevant," *United States v. Martinez–Gonzalez*, 686 F.2d at 100, and that "[t]he presence or absence of any one factor is not conclusive; rather, the essential question is whether there was 'urgent need' that 'justif[ied]' the warrantless entry," *United States v. Crespo*, 834 F.2d at 270 (quoting *Dorman v. United States*, 435 F.2d at 391). For example, as the Supreme Court has observed, "no exigency is created simply because there is probable cause to believe that a serious crime has been committed." *Welsh v. Wisconsin*, 466 U.S. at 753, 104 S.Ct. at 2099.

In each case in which we have concluded that the government established exigent circumstances justifying a warrantless entry, the record has included evidence of facts that made it objectively reasonable for the law enforcement officers to believe that time was of the essence. These have included a reasonable basis for fearing, for example, an imminent attempt to escape, a likely destruction of evidence, or a nonremote threat to life or safety. For example, in *Crespo*, the suspect had learned of the confidential informant's cooperation with the police and had threatened her and her children. Neither the agents nor the informant knew the suspect's last name or precisely which apartment was his. When the informant, with the agents watching, knocked on doors until she found the right apartment, the suspect was plainly alarmed to see that the informant now knew where he lived; he mentioned "killers" and said "my people will deal with you." 834 F.2d at 269. These facts, among others, provided a reasonable basis for the agents' view that there was an urgent need to enter the suspect's apartment to prevent, *inter alia*, his escape and his instructing his underlings to carry out his threats.

In *Cattouse*, it was not clear to the agents until late in the day which apartment the suspect was using for his narcotics business. The targeted premises were in a neighborhood inhabited predominantly by Blacks, and all of the surveilling agents were White, making it increasingly likely that, as the surveillance continued, it would be noticed. Further, the confidential informant advised that the narcotics supplier had lookouts in the area. We ruled that these facts provided an objective basis for the agents' fear that the suspect would detect their surveillance and remove or de-

stroy critical evidence before a search warrant could be obtained.

In *Martinez–Gonzalez,* the agents reasonably sought to question a suspect while he was outside the apartment he used as a stash pad. His alarm at their announcement that they were police officers and his dash into the apartment gave both probable cause for arrest and ample grounds for believing that he was likely to attempt to destroy evidence immediately.

In *Gallo–Roman,* the agents had intercepted mailed photographs under whose backing cocaine had been concealed. After the controlled delivery, the defendant was likely to notice that "the photographs had been tampered with, [and] it would become apparent that the scheme had been uncovered and that the authorities were near. Under these circumstances, the agents reasonably could have anticipated that the perpetrator would act quickly to destroy the evidence of unlawful conduct." 816 F.2d at 79.

In contrast, we have not upheld warrantless entries where the agents lacked any objective basis—other than their own actions unnecessarily alerting the defendants to their presence—to believe there was an urgent need to enter the premises without waiting to obtain a warrant. Thus, in *United States v. Reed,* we ruled that there were no exigent circumstances where the officers had made purchases from the targeted defendants some 2½ months earlier and had had no contact with them since:

> inasmuch as the DEA Agents had no contact whatsoever with Reed or Goldsmith for two and one-half months prior to their arrest, and since there is no suggestion of a change in the status of the investigation during that period, we cannot conclude that exigent circumstances were present.

572 F.2d at 424–25.

In *United States v. Agapito,* 620 F.2d 324 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), we invalidated a warrantless entry into a hotel room, which the government argued was needed to prevent the destruction of evidence. We noted that the only persons the agents had seen enter or leave the room during two days of surveillance had been arrested in the hotel lobby, 17 floors below the room, and that

> even if the agents here thought that accomplices remained in the room, there was no reason for them to believe that the accomplices knew of the arrests so that they might destroy evidence . . . .

*Id.* at 336.

In *United States v. Segura,* 663 F.2d 411 (2d Cir.1981), *aff'd on other grounds,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), we upheld a district court's finding that the circumstances were not exigent where the police had been able safely to conduct surveillance of an apartment for three hours, the arrest of one of the defendants at the front door of the building "could not have been observed from [the apartment], and there was no evidence that anyone saw the arrest and reported it to the inhabitants of [the apartment]." *Id.* at 415. The agents had created an exigency by their own actions in dragging the arrested defendant to the apartment and banging on the door. We declined to "permit[ ] the agents to 'create their own exigencies . . . and then "secure" the premises on the theory that the occupants would otherwise destroy evidence.'" *Id.* (quoting *United States v. Allard,* 634 F.2d 1182, 1187 (9th Cir.1980)); *see United States v. Rosselli,* 506 F.2d 627, 630 (7th Cir.1974).

The record in the present case persuades us that the district court's finding that the agents "had urgent need to make a warrantless entry in order to prevent the destruction or loss of evidence as well as to prevent the flight of the suspects" is clearly erroneous. The court relied principally on the seriousness of narcotics and firearms offenses, the ongoing nature of the criminal activity, the defendants' ability to use their weapons, and the information that the suspects controlled another apartment in the building, to which the evidence could be moved. The court cited as added factors the likelihood that the narcotics would be destroyed "once the agents had knocked on the door and identified themselves, and the door was not opened," and

the lateness of the hour making it difficult to obtain a search warrant quickly. The record, however, did not show any facts, prior to the agents' announcement of their presence as police officers, that objectively raised any likelihood of imminent flight, destruction of evidence, transfer of evidence, or violence.

■ First, though there can be no doubt that the gravity of the underlying crime is an important consideration, the fact that the offenses involved narcotics and weapons is insufficient by itself to justify a warrantless entry. Some urgency, apart from the nature of these offenses, must be demonstrated. None was apparent here. Though, as the district court noted, "it would have been a relatively simple matter, while the agents waited outside the building for a search warrant, for the suspects to transfer quantities of contraband from one apartment to another," simplicity should not have been the touchstone, for there was no basis in the record for believing such a transfer was imminent or likely.

There had been a narcotics operation in apartment 1–O at least as early as May, some four months before the agents began surveillance. If there was no reason to believe the occupants of that apartment had been alerted to the September 8 surveillance, there was no reason to believe that they would suddenly abandon their established location.

Agee's testimony made it clear that, prior to their official announcement of their presence, the agents had done nothing to alert the suspects. The surveillance was conducted by a team of agents whose ethnic makeup matched that of the civilians coming and going. The surveillance was inconspicuous; the building was large and there was a good deal of traffic in and out to apartments other than 1–O; the agents' vehicles were placed so circumspectly that even Agee did not know where those other than his own were parked. Nor had Agee been able to spot the agent who followed him into the building when he made his controlled buy.

The agents' questioning of visitors to apartment 1–O was likewise circumspect. For their only such interrogation, the agents followed the departing car for several blocks before stopping it; Agee testified that this encounter could not have been seen from 321 Edgecombe. Further, the agents had received no information and had seen no indication that the suspects had any kind of security devices in the apartment or had posted any lookouts in the area.

Nor did anything that occurred during Agee's purchase appear to alert the suspects. Agee testified that none of the occupants of the apartment knew who he was. He had never seen any of them before.

In short, until the moment seven agents knocked on the door and identified themselves as police officers, there was no basis whatever to believe the occupants would engage in anything other than business as usual. They apparently had operated from apartment 1–O for four months; and nothing had occurred prior to that moment to alert them to the agents' presence or to give the agents reason to believe the operation would be moved before a search warrant could be obtained. The fundamental question, therefore, of whether the officers had reason to believe there was an urgent need to enter without a warrant must, on this record, be answered in the negative.

Finally, we note that Agee's explanation for the agents' decision to return to the apartment defies belief. When asked what the purpose of this group sortie was, he testified that it was "[j]ust to talk to the person. Hopefully the person that sold me the marijuana would still be there and try to obtain a consent to search the apartment." For several reasons it is difficult to credit this stated purpose. First, the agents plainly already had ample probable cause for an arrest warrant or a search warrant on the basis of, *inter alia*, Agee's earlier visit to the apartment. They knew narcotics were there; Agee had already purchased marijuana; he had seen bags of marijuana and cocaine in plain view; they knew a stream of persons had made brief visits to the apartment; and Agee had seen two people counting large piles of money.

One wonders at any perceived need "[j]ust to talk" and seek a consent to search.

Second, in light of Agee's observation of two weapons in the apartment, one of them held cocked and pointed in his general direction, any notion that the occupants might docilely consent to a search seems at best surreal.

Third, the agents' approach to the apartment suggests that they had no genuine thought that they could obtain a consent. Seven of them approached *en masse.* They took a battering ram with them. When they knocked at the door, they already had their guns drawn.

These facts lead us to the conclusion that the agents, for no valid reason, went out of their way to alert the occupants to their official presence, thereby seeking to create an exigency. Despite their first-hand confirmation that a narcotics operation was ongoing, these agents had made no attempt to obtain a search warrant. They did not attempt to contact a government attorney to determine whether one could be obtained expeditiously; they did not even discuss a search warrant among themselves. If the circumstances shown here may properly be deemed "exigent," we doubt that agents who have compelling evidence of an ongoing narcotics operation will ever find it necessary to obtain a warrant.

We conclude that the record in this case makes clear that the agents had no reason to believe, prior to their pretextual announcement of their official presence, that there was an urgent need that justified a warrantless entry. Accordingly, if MacDonald had standing to challenge the entry into apartment 1–O, his motion to suppress should have been granted.

### B. *MacDonald's Standing*

A defendant has no right to have evidence suppressed on Fourth Amendment grounds unless the breached privacy expectation was his own rather than that of a third party. *See, e.g., Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 424–26, 58 L.Ed.2d 387 (1978). The defendant may demonstrate that his own legitimate expectation of privacy was infringed by showing that he owned the premises or that he occupied them and had dominion and control over them by leave of the owner. *See Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 2549–50, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. at 140–48, 99 S.Ct. at 428–33.

MacDonald, in his brief on appeal, asserts that the district court found that he had standing to challenge the entry into apartment 1–O. We do not so view the record. As we read the transcript, the court indicated that it would merely "assume" that MacDonald had standing, since a finding of exigent circumstances would make it unnecessary to decide the standing issue.

Accordingly, in light of our ruling that the circumstances were not exigent, the issue of standing must be decided. We therefore remand the matter to the district court for a finding on that issue. We retain jurisdiction of MacDonald's appeal and will postpone consideration of his other arguments on appeal pending the district court's decision on standing.

### C. *Thomas's Requested Identification Instruction*

At trial, Agee testified that when he made his controlled purchase, Thomas was in apartment 1–O. He testified that Thomas was the man he had seen holding the cocked nine millimeter pistol pointed in Agee's general direction.

Thomas testified that he was not part of the narcotics trafficking operation. He said he had come to the apartment to purchase marijuana, that he had arrived there just five minutes before the agents entered, and that in fact he had not been there when Agee made his undercover purchase. He contended that Agee's identification of him was mistaken. He asked the trial court "to consider a separate charge on the question of identification testimony, because ... Agee was in this area for a short period of time, and there is nothing in

[his] recollection about the identification of various people." Thomas's only contention on appeal is that the district court erred in refusing to give such an instruction to the jury. We find no basis for reversal.

■] The decision whether to give the jury an instruction emphasizing the frailties of identification evidence lies in the discretion of the trial judge. *See, e.g., United States v. Hernandez,* 862 F.2d 17, 24 n. 3 (2d Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989); *United States v. Luis,* 835 F.2d 37, 41 (2d Cir.1987). In determining whether to give such an instruction, the court may properly consider, *inter alia,* the witness's opportunity to view the suspect at the time of the crime, the witness's experience as a law enforcement official trained to make detailed observations, his degree of attention, and the length of time between the witness's initial observation and his identification of the suspect upon or following arrest. *Id.* at 41–42; *see also Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972).

In view of the facts, among others, that the apartment was well lighted, that Agee was a law enforcement official trained to be attentive in the matter of identification of suspects, that he was in the apartment for 2–3 minutes with nothing to do but observe, that a person holding a cocked gun naturally attracts attention, that it is indisputable that Thomas was in the apartment on that evening, and that only 10 minutes had elapsed between the initial viewing and Thomas's arrest by Agee, the district court did not abuse its discretion in determining that a special instruction on identification evidence was not necessary.

## CONCLUSION

For the foregoing reasons, the conviction of Thomas is affirmed. We reserve decision as to the conviction of MacDonald, and the matter is remanded to the district court for a finding as to his standing to challenge the warrantless entry. We retain jurisdiction of MacDonald's appeal.

ALTIMARI, Circuit Judge, concurring in part, and dissenting in part:

I concur in the majority's well-reasoned opinion as it relates to defendant Thomas. However, I respectfully dissent from the opinion as it relates to defendant MacDonald.

At the conclusion of a hearing, the district court denied MacDonald's motion to suppress certain items of physical evidence, including large quantities of drugs, several loaded firearms, stacks of money and assorted drug paraphernalia, seized from a one-room efficiency apartment in Manhattan used by MacDonald and his associates as a narcotics exchange. The district court found that exigent circumstances justified an exception to the Fourth Amendment's search warrant requirement. I agree. *See United States v. Zabare,* 871 F.2d 282 (2d Cir.1989); *United States v. Cattouse,* 846 F.2d 144 (2d Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988). In order to find that an exception is justified, the district court must determine that the law enforcement agents had probable cause to enter the apartment and a reasonable belief that exigent circumstances existed. *United States v. Gomez,* 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981).

The plain facts of this case fully support the district court's findings. As the proof proffered at the hearing demonstrated, the law enforcement agents had probable cause to believe that the defendants had committed a narcotics trafficking offense and that contraband would be found in the apartment. Both the observations made by the surveillance officers immediately prior to the undercover purchase and those made by Agent Agee while he was inside the apartment gave rise to the law enforcement agents' belief. The majority's apparent position that the agents could easily have obtained a search warrant implies that probable cause existed. In any event, the defendant does not argue a lack of probable cause, and the issue seems to me to be beyond dispute.

The real issue here is whether the district court erred when it determined that exigent circumstances justified the warrantless entry. We have held that "[t]he determination of exigent circumstances turns upon whether in light of all the facts of a particular case ... an 'urgent need' " sanctioned the warrantless entry. *United States v. Martinez–Gonzalez*, 686 F.2d 93, 100 (2d Cir.1982) (quoting *Dorman v. United States*, 435 F.2d 385, 391 (D.C.Cir.1970) (en banc)). On numerous occasions, we have pointed to a list of "various factors that may be used to determine whether 'exigent circumstances' are present." *United States v. Reed*, 572 F.2d 412, 424 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978) (quoting *Dorman*, 435 F.2d at 392–93); *see also*, *Cattouse*, 846 F.2d at 146; *United States v. Crespo*, 834 F.2d 267, 270 (2d Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988); *Martinez–Gonzalez*, 686 F.2d at 100; *United States v. Campbell*, 581 F.2d 22, 26 (2d Cir.1978). Although the majority opinion acknowledges the factors, it concludes that "the district court's finding that the agents 'had urgent need to make a warrantless entry in order to prevent the destruction or loss of evidence as well as to prevent the flight of the suspects' is clearly erroneous." In so doing, the majority conclusion puts an entirely new gloss on the exigent circumstances exception.

Consistent with the well-settled law of this circuit, the district court properly assessed the several illustrative factors in light of all the facts of the case. The district court first pointed to the gravity of the offenses involved and concluded that the "[p]resence of the narcotics and the weapons under the circumstances suggested that the defendants were engaged in ongoing criminal activities and were in a position to use the weapons thereby creating an emergency situation justifying immediate entry." When Agent Agee entered the apartment, he was confronted by Paul Thomas who held a cocked nine millimeter pistol four feet from his head. One of four other men in the apartment, Errol MacDonald, was counting a large stack of money with a loaded .357 magnum revolver next to him. Agee observed large quantities of cocaine and marijuana packaged and ready for sale. He smelled marijuana in the smoke-filled room as he purchased five dollars worth of marijuana with a pre-recorded bill. The highly volatile mix of loaded weapons and drug abuse created an emergency situation that could explode at any moment. It was ten o'clock at night, and would have taken a minimum of two or three hours to obtain the warrant. Under these circumstances, the law enforcement agents "certainly could not assure stability while they sought a warrant." *Cattouse*, at 148. Indeed, "the greater the delay in arresting [the suspects], the greater the danger to the arresting agents and the community." *Martinez–Gonzalez*, 686 F.2d at 101; *accord United States v. Gallo–Roman*, 816 F.2d 76, 80–81 (2d Cir. 1987); *United States v. Farra*, 725 F.2d 197, 199 (2d Cir.1984); *Campbell*, 581 F.2d at 26. On the basis of these particular facts, I fail to comprehend how the district court's finding that an urgent need justified the warrantless entry was clearly erroneous.

Moreover, the district court found that the law enforcement agents had an urgent need to make a warrantless entry to prevent the loss of evidence. The agents had been informed that the suspects controlled at least one other apartment in the building. Given the ease with which the suspects could have moved the contraband from one apartment to another, the agents had reason to secure the apartment in question immediately. The district court also noted that the suspects would have had no difficulty disposing of the cocaine by flushing it down the toilet. The district court reasoned that obtaining a warrant at ten o'clock in the evening "would have taken a matter of hours, thereby increasing the risk that evidence would be lost or destroyed." Once the agents had knocked on the door and identified themselves, any delay in entering would have rendered the risk of evidence destruction all but definite. *See Farra*, 725 F.2d at 199; *Martinez–*

*Gonzalez,* 686 F.2d at 101; *Gomez,* 633 F.2d at 1006.

In addition, the district court found that the law enforcement agents "had an urgent need to make a warrantless entry in order to prevent ... the flight of the suspects." Requiring the agents to wait several hours while a warrant was obtained would have allowed the possibility that the suspects might escape them. After knocking at the apartment door and identifying themselves, the agents heard sounds of fast movement from inside. At that moment, they were notified by radio from other agents waiting in the street that the suspects were attempting to escape through the apartment windows. Upon receiving this transmission, the agents used a battering ram and forcibly entered the apartment. Once the agents had announced themselves in good faith, the fleeing defendants presented them with all the more urgent need to enter the apartment without a warrant. As the actual attempted flight of the suspects demonstrates, any delay by law enforcement agents after knocking may well have rendered the escape successful. *Cf. Dorman,* 435 F.2d at 391 (hot pursuit illustrates the kind of exigent circumstances that justifies a warrantless entry); *Martinez–Gonzalez,* 686 F.2d at 102 (same).

In light of all the facts of this case, I am compelled to disagree with the majority's conclusion that the district court's determination of exigent circumstances was clearly erroneous. *See Zabare,* 871 F.2d at 290 (finding of exigent circumstances must be made in examination of the "totality of the circumstances").

The majority, however, believes that the law enforcement agents impermissibly manufactured the exigent circumstances by knocking on the apartment door and announcing themselves. We have previously reasoned that agents did not intentionally design exigent circumstances by using (1) an all-white surveillance team in a predominantly black neighborhood, and thus exposing the agents to a great risk of detection, *Cattouse,* 846 F.2d at 147, 148; (2) marked buy money in a controlled drug deal, and thus compelling the agents to act immediately lest the money be dissipated, *Id.;* (3) counterfeit tickets marked void, and thus endangering the lives of agents and occasioning the possibility of destruction of the evidence when the suspect unwrapped the package and discovered the markings, *Zabare,* 871 F.2d at 290. It follows that agents here did not create exigent circumstances simply as a pretext to violate the fourth amendment.

The majority observes that the agents arrived at the apartment with a battering ram and their guns drawn, and on this basis suggests that the agents acted in bad faith. The agents had every reason for expeditiously defusing the ongoing illegal sale of narcotics in a potentially explosive situation. If they had not done so, they would have been derelict in their duty. Although law enforcement agents are required to be innocent, they are not required to be naive.

Today's majority decision reflects dissatisfaction with the exigent circumstance exception itself rather than its correct application to the facts of this case. For the reasons given above, I would affirm the convictions of both appellants Thomas and MacDonald.