**UNITED STATES of America**

**v.**

**Jose ACOSTA, a/k/a "Jose Diaz" a/k/a "Agapito Velazquez", Manuel Acosta, Martha Ovalle, a/k/a "Dania Montesano".**

Crim. A. No. 91–00323–01 through 91–00323–03.

United States District Court, E.D. Pennsylvania.

Feb. 21, 1992.

L.C. Wright, Asst. U.S. Atty., for U.S.

Edward Daly, Richard Shore, Peter A. Levin, Howard D. Popper, Alan L. Yatvin, Philadelphia, Pa., for Acosta.

## MEMORANDUM AND ORDER

DuBOIS, District Judge.

Defendants Jose Acosta, Manuel Acosta, and Martha Ovalle are charged with conspiracy to possess with the intent to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) & 846, possession of cocaine and cocaine base with the intent to distribute in violation of 21 U.S.C. § 841(a)(1), and aiding and abetting with the intent to distribute cocaine and cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. In addition Jose Acosta is charged with knowing and willful use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).

Presently before the Court are the pretrial motions of defendants Jose Acosta, Manuel Acosta, and Martha Ovalle to suppress evidence under Fed.R.Crim.P. 12(b)(3) and 41(f). The three defendants have submitted essentially identical motions to suppress: (1) the physical evidence found in the defendants' apartment and outside the bathroom window in the backyard of the defendants' apartment,[1] and (2) evidence of the law enforcement officers' observations of the defendants and the apartment and any statements taken from the defendants subsequent to the law enforcement officers alleged illegal entry and search of defendants' apartment, on July 23, 1991. They contend all are the fruit of an illegal warrantless entry and search of their apartment.

The defendants contend that: (1) the warrantless search of defendants' residence was presumptively unreasonable and in violation of the Fourth Amendment;[2] (2) the arrest warrant for a third person, Carlos Santiago, did not provide the law enforcement officers with authority to enter or search defendants' apartment since they did not possess a separate search warrant;[3] (3) the search of defendant's apartment does not fall under the exigent circumstance exception to the Fourth Amendment's warrant requirement; (4) any exigent circumstances were unlawfully cre-

---

1. The apartment involved in this case was leased to Jose Acosta and Martha Ovalle. (Memo in Support of Gov.'s Opposition to Def.'s Motions to Suppress, at 5.) The Court finds, *infra,* that Manuel Acosta was an overnight guest in the apartment. For ease of exposition the Court may refer to the apartment as "defendants'" apartment.

2. The government agrees that a warrantless search, unless it fits under an exception, is un-

reasonable. However, the government argues the exigent circumstance exception applies to this case. (Memo. in Support of Gov.'s Opposition to Def.s' Motions to Suppress, at 7.)

3. The government concedes that Carlos Santiago's arrest warrant did not authorize the officers' entry into defendants' apartment. (Memo. in Support of Gov.'s Opposition to Def.s' Motions to Suppress, at 7.)

ated by the law enforcement officers; and (5) the evidence seized pursuant to the search warrant executed on July 25, 1991, the law enforcement officers' observations of defendants and the apartment, and any statements taken from the defendants subsequent to the law enforcement officers' alleged illegal entry and search of defendants' apartment on July 23, 1991, are the fruit of the law enforcement officers' illegal conduct and therefore must be suppressed.

The government contends that: (1) the requirements of the exigent circumstance exception to the Fourth Amendment's warrant requirement are satisfied; (2) the exigent circumstances which arose in this case were not impermissibly created; (3) the evidence seized from outside the apartment window was "abandoned" and therefore were lawfully seized; and (4) the evidence seized from outside the bathroom window was lawfully seized pursuant to the plain view exception to the Fourth Amendment's warrant requirement.

The defendants' suppression motions raise the following issues which the Court will address: (1) whether exigent circumstances were present; (2) whether exigent circumstances were impermissibly created by the law enforcement officers because they: (a) entered the unlocked common hallway of defendants' multi-unit apartment building in an effort to execute an arrest warrant for Carlos Santiago;[4] (b) improperly asserted authority to enter defendants' apartment by the way they knocked and announced themselves, and/or (c) entered the enclosed backyard of 522 West Venango Street in which defendants rented a first floor apartment in an effort

to execute an arrest warrant for Carlos Santiago; (3) whether the evidence seized outside the bathroom window was "abandoned" by the defendants or lawfully seized pursuant to the plain view exception to the Fourth Amendment's warrant requirement; and (4) whether the evidence seized pursuant to a search warrant executed on July 25, 1991, evidence of the law enforcement officers' observations of defendants and the apartment, and any statements taken from the defendants subsequent to the law enforcement officers alleged illegal entry and search of defendants apartment, on July 23, 1991, should be suppressed as the fruit of the law enforcement officers' illegal conduct.

A suppression hearing was held on October 18, 1991 and October 25, 1991 on the issues raised by defendants' suppression motions.[5] A supplemental suppression hearing was held on December 13, 1991 for the limited purpose of introducing evidence with respect to: (1) the question of the defendants' expectations of privacy in the backyard of the apartment house at 522 West Venango Street, Philadelphia, Pennsylvania, (Order, December 9, 1991); and (2) whether law enforcement officers entered the backyard area of the apartment house at 522 West Venango Street, Philadelphia, Pennsylvania, and if so, how they did so. (Order, December 4, 1991.)

This Court concludes that: (1) exigent circumstances were present, (2) the exigent circumstances were impermissibly created by the law enforcement officers because of the unlawful entry into the defendants' backyard but not by their entry into the common hallway or their method of knock-

---

4. At the hearing, the government abandoned the argument that, pursuant to the good faith exception, the law enforcement officers' entry into the common hallway of 522 West Venango Street to execute an arrest warrant for Carlos Santiago was lawful. (Transcript of Suppression Hearing (hereafter "Tr.") October 25, 1991, at 245.) As a result, the Court will not address the good faith issue. The government did, however, contend that the defendants did not have a reasonable expectation of privacy in the common hallway of 522 West Venango Street and therefore the law enforcement officers entry was lawful.

5. After the hearing on October 25, 1991, the Government submitted an Affidavit of Willie Torres dated November 26, 1991, on the issue of defendants' non-exclusive use of the backyard at 522 West Venango Street. The Court, in its discretion, will not consider the Affidavit as evidence because it was submitted *ex parte*. *Cf. U.S. v. Johnson*, 944 F.2d 396, 403 n. 5 (8th Cir.1991) (abuse of discretion standard applied in similar situation), *cert. denied*, — U.S. —, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991). However, the Court will consider the testimony of Willie Torres at the December 13, 1991 hearing on the same subject.

ing and announcing themselves, (3) the evidence seized from outside the defendants' bathroom window was neither abandoned nor lawfully seized pursuant to the plain view exception to the warrant requirement of the Fourth Amendment; and (4) the fruit of the police officers' unlawful conduct, including the evidence seized pursuant to the execution of the July 25, 1991, search warrant for Defendants' apartment, will be suppressed. Accordingly, defendants' suppression motions will be granted.

## I. Statement of the Case

On July 23, 1991, at 6:00 A.M., agents of the Drug Enforcement Agency (hereafter "DEA"), deputy U.S. Marshals, and Philadelphia police officers [6] went to 522 West Venango Street, Philadelphia, Pennsylvania. (Tr., October 25, 1991, at 40–41; Ex. D–1, at ¶ 3.) These officers possessed an arrest warrant for Carlos Santiago. (Tr., October 25, 1991, at 41.) The arrest warrant did not contain an address for execution. (Ex. G–1; Tr., October 25, 1991, at 43–44.) However, the warrant was accompanied by an envelope on which there was written three possible addresses, including the 522 West Venango Street address. (Ex. G–2.) Special Agent Allen was told by his superior, William Renton, that 522 West Venango Street was Carlos Santiago's "primary" address. (Tr., October 25, 1991, at 162.)

Upon arriving at 522 West Venango Street, the team realized for the first time that the building was a three story apartment building with three separately secured apartments. (Ex. G–5; Tr., October 25, 1991, at 67.) Prior to entering the apartment building, Special Agent Allen, with the "consensus" of the other Team members, reached the "decision to start with the first floor apartment and work

upward if necessary." (Ex. D–1, at ¶ 3; Tr., October 25, 1991, at 67.) Special Agent Allen then directed Special Agent Barry DeProsperis and Deputy Marshal Michael Burke "to go around and cover the rear in case somebody [Carlos Santiago] tried to, you know, come out of the window in back or come out a back door." (Tr., October 25, 1991, at 73.)

Pursuant to that instruction, Special Agent DeProsperis proceeded to the rear of the building and entered the fenced backyard by scaling the fence which enclosed it.[7] (Tr., December 13, 1991, at 43.) He then took a position in the yard so that he would be in the "best position ... [to] see the windows, the side [of the building], the door in the back and the windows on the other side [of the building]." (Tr., December 13, 1991, at 46.)

In an effort to enter the apartment building Special Agent Allen rang the bell at the outer doorway. (Tr., October 25, 1991, at 73–74.) When this was unsuccessful, one of the Team members turned the doorknob of the outer door and discovered that the door was unlocked. (Tr., October 25, 1991, at 74.) The Team members then proceeded to the only first floor apartment. (Ex. G–6; Tr., October 25, 1991, at 75.) Special Agent Allen knocked on the apartment door and said several times "it's the police; open the door ... I have a warrant; open the door." (Tr., October 25, 1991, at 76–77.) Finally, an occupant inside asked Special Agent Allen, who was at the door. (Tr., October 25, 1991, at 77.) Special Agent Allen responded by repeating what he had just said. (Tr., October 25, 1991, at 77.) Following that Special Agent Allen heard "scuffling noises," a "commotion going on in the apartment," and a "flushing noise",[8] (Tr., October 25, 1991, at 77), all

---

6. This group of law enforcement agents is referred to as the "Team". Special Agent Charles Allen was the Team leader. (Ex. D–1, at ¶ 3.)

7. There is no evidence as to were Deputy Marshal Burke was positioned while Special Agent DeProsperis was in the backyard. (Tr., October 25, 1991, at 68.)

8. Special Agent Allen's credibility was attacked with respect to his ability to hear the toilet

flush. The defendants had a private investigator run a test, in which he listened at the door while Mr. Shore, counsel for Jose Acosta, flushed the toilet, allegedly three times. (Tr., October 25, 1991, at 228–29.) It was the private investigator's testimony that he could not hear the toilet flush. (Tr., October 25, 1991, at 226–29.) The test took place on October 17, 1991, (Tr., October 25, 1991, at 215), almost three months after the events at issue.

from inside the apartment. At about the same time, he heard Special Agent DeProsperis, whom he had directed to the rear of the apartment building, (Tr., October 25, 1991, at 73), shout that "they were throwing stuff out the window," (Tr., October 25, 1991, at 77), and that he thought somebody was coming out the window. (Tr., October, 25 1991, at 172.) Special Agent Allen "assumed" that Special Agent DeProsperis was shouting about a window in the first floor apartment, (Tr., October, 25, 1991, at 176), and knew that the term "stuff" meant narcotics as that was a term of art in the narcotics trade, (Tr., October 25, 1991, at 123); so he and Police Officer William Jeitner kicked the defendants' apartment door down.[9] (Tr., October 25, 1991, at 77.)

Immediately after breaking the door down, Special Agent Allen saw Jose Acosta in the living room, just outside the doorway leading to the bedroom. (Tr., October 25, 1991, at 79–80.) As the Team proceeded into the apartment they ordered Jose Acosta onto the floor. (Tr., October 25, 1991, at 80.) Once inside the apartment, Agent Allen saw Manual Acosta coming out of the bathroom and ordered him to the floor. (Tr., October 25, 1991, at 81.) Finally, Special Agent Allen saw Ms. Ovalle sitting on the right side of the bed. (Tr., October 25, 1991, at 81.) Members of the Team brought all three defendants into the bedroom and made them lay on the floor. (Tr., October 25, 1991, at 96–97.) Manual Acosta was the only defendant who was handcuffed. (Tr., October 25, 1991, at 97.)

Police Officer Jeitner found a plastic bag containing cocaine next to the bed. (Tr., October 25, 1991, at 84–85.) Then the Team did a protective "sweep" of the apartment because they were still looking for Carlos Santiago. (Tr., October 25, 1991, at 97–98.) The protective "sweep" of the apartment and of its exterior yielded, *inter alia:* two loaded nine millimeter semi-automatic pistols from under the bed;

numerous vials of suspected crack cocaine found outside the bathroom window; numerous empty vials of the type commonly used to package crack found inside the apartment; a scale, covered in cocaine residue, of the type commonly used to weigh cocaine and crack found in the closet; large sums of United States currency found in various locations inside the apartment; an electronic scale found outside the bathroom window; two boxes of ammunition found inside the apartment; and two electronic pagers found inside the apartment. (Tr., October 25, 1991, at 129–33.)

The defendants were then arrested and read their *Miranda* warnings in Spanish after they had been transported to "the office". (Tr., October 25, 1991, at 137.) After being Mirandized the defendants told Special Agent Frank Marrero, the Spanish speaking agent who had Mirandized them, that they did not live at 522 West Venango Street, that they lived in New York, that they had only been staying overnight, and that they were unemployed. (Tr., October 25, 1991, at 145.)

After the defendants were arrested, Special Agent Allen and Deputy Marshal Burke proceeded to the other apartments in the building to continue the search for Carlos Santiago. (Tr., October 25, 1991, at 135–36.) When they arrived at the third floor, they knocked on the apartment door and identified themselves as police officers. A young lady answered the door and the officers asked if Carlos Santiago was there. (Tr., October 25, 1991, at 137.) The occupant said Carlos Santiago was not there yet gave consent to Special Agent Allen and Deputy Marshal Burke to search her apartment for Carlos Santiago. (Tr., October 25, 1991, at 137.) Special Agent Allen and Deputy Marshal Burke then searched the apartment for about five minutes, found nothing, and left. (Tr., October 25, 1991, at 137.)

---

The Court finds that Special Agent Allen's testimony that he heard "flushing noises" is credible. The Court rejects the defendants' test as evidence that Special Agent Allen did not or could not have heard the toilet flush because there is no evidence that the conditions were the same or similar on October 17 and July 23, 1991.

**9.** The Team did not anticipate having to forcibly enter apartments. As a result, the Team did not have their usual equipment for forcing entry. (Tr., October 25, 1991, at 74.)

After the arrest, Special Agent Allen obtained a search warrant for defendants' apartment. The warrant was executed on July 25, 1991, and additional items were seized. (Def.'s Motion to Suppress, at ¶ 21; Gov. Opposition to Def.s' Motion to Suppress Evidence, at ¶ 21 (admitted).)

## II. Burden of Proof

The burden of proof in a suppression hearing in which the government seeks to introduce evidence under one of the exceptions to the warrant requirement of the Fourth Amendment has been set forth as follows:

> If the search was without a warrant, the burden is on the United States to bring the case within one of the exceptions to the warrant requirement ... The party who carries the burden need do so in each instance only by a preponderance of the evidence.

3 Charles A. Wright, *Federal Practice and Procedure* § 675 at 782–84 (1982 & Supp. 1991) (footnotes omitted); *see also United States v. Myers,* 700 F.Supp. 1358, 1361 (D.N.J.1988) ("The government concedes that the burden is on them to establish the reasonableness of a warrantless search ... by a preponderance of the evidence ...") (citations omitted); *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (citations omitted). The Court adopts this standard in this case.

## III. Discussion [10]

### A. Exigent Circumstances Were Present

■ A finding of exigent circumstances in a case such as this requires a

two prong inquiry: (1) there must be probable cause to believe contraband is present, and (2) based on the surrounding circumstances or the information at hand, the law enforcement officers must reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant. *U.S. v. Rubin,* 474 F.2d 262, 268 (3d Cir.1973), *cert. denied, Agran v. U.S.,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973).[11]

Under *Rubin's* first prong, the Court concludes that probable cause was created when Special Agent DeProsperis shouted from the rear of the apartment building that "they were throwing stuff out the window," (Tr., October 25, 1991, at 77), because Special Agent Allen understood the term "stuff" meant cocaine when he heard this shout. (Tr., October 25, 1991, at 123.) The "scuffling" and "flushing" noises which preceded the shouting did not, standing alone and under the circumstances of this case, create probable cause to break into defendants' apartment.

Under *Rubin's* second prong, the Third Circuit identified five circumstances which Courts have found relevant to determining if time is of the essence in the context of a drug case:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant, ... (2) reasonable belief that the contraband is about to be removed, ... (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought, ... (4) information indicating the possessors of the contraband are aware that the police are on there trail, ... and (5) the ready destructibility of the contraband and the knowledge 'that efforts to dispose of narcotics and to escape are

**10.** To the extent that this opinion differs in any way from that given in open court when the suppression motions were granted on December 20, 1991, this opinion controls.

**11.** Defendants cite *United States v. Thomas,* 893 F.2d 482, 490 (2d Cir.1990), *vacated en banc, United States v. MacDonald,* 916 F.2d 766 (2d Cir.1990), *cert. denied, MacDonald v. United States,* — U.S. —, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991), and claim it contains language

which requires a showing of facts that objectively raise a likelihood of flight or destruction of evidence before the agents announce their presence as police officers. (Def.s' Response to Gov. Answer to Motion to Suppress, at 8–9.) The defendants' reliance on *Thomas* is misplaced. *Thomas* was vacated by *United States v. MacDonald,* 916 F.2d 766, 771–73 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991).

characteristic behavior of persons engaged in the narcotics traffic,' ...

*U.S. v. Rubin*, 474 F.2d at 268 (citations omitted).

Applying these factors to the case at bar, the Court concludes that time was of the essence because there is evidence of four of the five *Rubin* factors. The "scuffling" and "flushing" noises and the shouting of Special Agent DeProsperis, (Tr., October 25, 1991, at 77), are evidence that contraband was present, that law enforcement officers needed to act quickly before evidence could be destroyed, that the defendants were aware the police were on their trail, that the defendants were attempting to dispose of contraband quickly, and that defendants were conscious of the illegality of their actions. The Court thus finds evidence of factors two, four, and five, and evidence of the degree of urgency involved, as set forth in factor one. Although there was no evidence of factor three, danger to police officers, or the amount of time necessary to obtain a warrant as included in factor one, such lack of evidence does not derogate from the Court's conclusion that time was of the essence.

**B. The Exigent Circumstances Were Impermissibly Created by the Law Enforcement Officers Because of the Unlawful Entry into the Defendants' Backyard in an Effort to Execute an Arrest Warrant for a Third Person, Carlos Santiago, but Not by Their Entry into the Common Hallway of the Apartment Building or by Their Method of Knocking and Announcing Themselves**

■ The application of the exigent circumstances exception to the warrant requirement of the Fourth Amendment will depend upon whether the Team impermissibly created the exigent circumstances in this case. The courts have held that law enforcement agents may not impermissibly create their own exigent circumstances. *See, e.g., United States v. Munoz–Guerra*, 788 F.2d 295, 298 (5th Cir.1986) ("the government [can] not justify a warrantless search on the basis of exigent circumstances of its own making") (citation omitted).

The Third Circuit has not addressed the issue of the creation of exigent circumstances by law enforcement officers. This Court therefore looks to the other Circuits for guidance. Among those Circuits addressing the issue, there appear to be at least two standards for assessing whether police conduct impermissibly creates exigent circumstances.

First, some circuits have adopted a standard in which conduct short of illegal conduct can impermissibly create exigent circumstances. Such a standard was enunciated by the Eighth Circuit in *United States v. Duchi*, 906 F.2d 1278 (8th Cir.1990). The Court in *Duchi* sets forth its standard as follows:

For the claim of exigent circumstances to be adequately evaluated, the better question to ask is: how did those urgent circumstances come about? This antecedent inquiry—*into the reasonableness and propriety of the investigative tactics that generated the exigency*—seems to be what Courts have in fact been doing in these kinds of cases ... *We adopt this antecedent inquiry into the appropriateness of investigative tactics as the principled way to evaluate whether the officers created the exigent situation.* There is no question that the deliberate creation of urgent circumstance is unacceptable ... But bad faith is not required to run afoul of the standard we adopt and apply today.

*Duchi*, 906 F.2d at 1284 (emphasis added) (citations omitted).

■ Second, some circuits have set forth a standard in which only illegal conduct can impermissibly create exigent circumstances. Such a standard was enunciated by the Second Circuit in *United States v. MacDonald*, 916 F.2d 766 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991). The Second Circuit summarized its rule as follows:

the fact that the agent may be 'interested' in having the occupants react in a way that provides exigent circumstances and may 'fully expect[ ]' such a reaction does not invalidate action that is otherwise lawful. We simply shall not engage

in futile speculation as to whether the agents actually expected the suspects to respond lawfully to their knock at the door ... [W]e hold that *when law enforcement agents act in an entirely lawful manner, they do not impermissibly create exigent circumstances.* Law enforcement agents are required to be innocent but not naive.

*MacDonald,* 916 F.2d at 772 (emphasis added).

This Court finds that the less expansive approach adopted by the Second Circuit in *MacDonald* is more persuasive. Thus the issue before the Court is whether the exigent circumstances found in this case were impermissibly created by the unlawful conduct of law enforcement officers.

**(1) The Entry into the Unlocked Common Hallway of Defendants' Multi–Unit Apartment Building by Law Enforcement Agents in an Effort to Execute an Arrest Warrant for a Third Person Was Lawful**

■ The Third Circuit has not ruled on whether tenants have a reasonable privacy interest in the common areas of a multi-unit apartment dwelling. *But see United States v. Bedford,* 519 F.2d 650, 660 (3d Cir.1975) (Rosenn, J., dissenting), *cert. denied, Bedford v. U.S.,* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976). Judge Rosenn, after pointing out that the majority had not reached the issue, wrote in his dissent that he believed tenants in an apartment building had a reasonable expectation of privacy in the common areas of the building. That statement, made in a dis-

senting opinion, is not precedential and the Court does not find it persuasive.

The Court recognizes that a conflict between the Circuits exists with respect to this issue. The defendants urge that the Court follow the Sixth Circuit which has held that tenants have a privacy interest in common areas of an apartment building. *United States v. Carriger,* 541 F.2d 545, 552 (6th Cir.1976) ("[W]hen, as here, an officer enters a locked building, without authority or invitation, the evidence gained as a result of his presence in the common areas of the building must be suppressed."). The Court declines to do so.

The Court finds unpersuasive the Sixth Circuit's rationale that "[a] tenant expects other tenants and invited guests to enter in the common areas of the building, but he does not except [sic] trespassers." *United States v. Carriger,* 541 F.2d at 551. The Court concludes police officers should not be characterized as ordinary trespassers when entering the common areas of an apartment building. Tenants expect police officers to peaceably enter apartment building common areas when they are conducting investigations.[12]

Instead, the Court follows the rule of *United States v. Holland,* 755 F.2d 253, 255 (2d Cir.1985), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985), because it is well reasoned and is supported by the majority of the Circuits which have ruled on the issue.[13] In *Holland,* the Second Circuit concluded that "it is the established law of this Circuit that the common

**12.** The Court also notes that a recent unpublished Sixth Circuit opinion has recognized that the area is unsettled. *United States v. Smith,* 941 F.2d 1210, 1210 (6th Cir.1991).

**13.** *See, e.g., United States v. Acevedo,* 627 F.2d 68, 69 n. 1 (7th Cir.1980), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482 (1980) ("It is well settled that observations made by law enforcement officials from the common areas of multi-unit dwellings ordinarily do not violate a resident's reasonable expectation of privacy") (citations omitted); *United States v. Luschen,* 614 F.2d 1164, 1173 (8th Cir.1980), *cert. denied, King v. United States,* 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980) ("There is no reasonable expectation of privacy in halls and common areas of apartment buildings"); *United States v. Penco,* 612 F.2d 19, 24–25 (2d Cir.1979)

("Fourth Amendment protection accorded an apartment dweller's home does not extend to the lobby of his apartment building ... or the area just inside the hall door that was meant to lock but did not ... or the hallway just outside his apartment door") (citations omitted); *United States v. Shima,* 545 F.2d 1026, 1029 (5th Cir. 1977), *on reh.,* 560 F.2d 1287 (5th Cir.1977), *cert. denied,* 434 U.S. 996, 98 S.Ct. 632, 54 L.Ed.2d 490 (1977) (no expectation of privacy in multi-unit dwellings common walkway); *United States v. Cruz Pagan,* 537 F.2d 554, 557–58 (1st Cir.1976) (no expectation of privacy in multi-unit dwelling's common underground parking garage); *United States v. Anderson,* 533 F.2d 1210, 1214 (D.C.Cir.1976) (no expectation of privacy in common corridors of a rooming house).

halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors." *Holland*, 755 F.2d at 255. The *Holland* Court persuasively reasoned:

> [T]his rule [that there is no privacy interest in common areas] gives tenants the benefit of much-needed police protection in common hallways, ... while it preserves for them the privacy of their actual places of abode, their apartments.

*United States v. Holland*, 755 F.2d at 256 (citations omitted).

Applying the *Holland* rule to the facts of this case, the Court concludes that the warrantless entry by law enforcement agents into the unlocked common hallway of 522 West Venango Street was lawful because tenants can reasonably expect police officers to peaceably enter common areas of apartment buildings when conducting investigations and therefore have no reasonable expectation of privacy in such areas. Thus, Special Agent Allen was lawfully standing in front of the defendants' apartment door before he knocked and announced himself. The Court therefore finds that exigent circumstances were not impermissibly created by the Team members' entry into the common hallway of 522 West Venango Street.

**(2) The Team Members Did Not Unlawfully Assert Authority to Enter the Defendants' Apartment by the Way They Knocked and Announced Themselves**

■ The police officers in this case knocked on the apartment door, identified themselves as police officers, said they had a warrant, and said "open the door." (Tr., October 25, 1991, at 75–77.) The defendants argue that the words "open the door" evidenced an intent to enter, which was illegal in view of the fact that Special Agent Allen had an arrest warrant for Carlos Santiago and not a search warrant

for defendants' first floor apartment. Expanding this argument, defendants' contend that it was "an improper assertion of authority" which could only be interpreted to mean that Special Agent Allen had a search warrant for defendants' apartment. (Tr., October 25, 1991, at 258–59.)

Defendants cite *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) in support of their contention that Special Agent Allen's statement "open the door" made in conjunction with his statement that he had a warrant, (Tr., October 25, 1991, at 75–76), was illegal. The Court concludes that *Bumper* is inapposite as it involves the consent to search exception to the warrant requirement and its holding pertains only to the requirements of that exception. The *Bumper* decision does not hold that conduct such as that of Special Agent Allen is illegal. *Bumper*, 391 U.S. at 548–50, 88 S.Ct. at 1791–92.

The Court concludes that Special Agent Allen's method of knocking and announcing himself was not unlawful. Although it might have been preferable for him to have been more specific in describing the nature of the warrant he was attempting to execute, his conduct did not unlawfully create the exigent circumstances in this case.

**(3) The Entry by Law Enforcement Agents into the Enclosed Backyard of an Apartment Building in Which Defendants Rented a First Floor Apartment in an Effort to Execute an Arrest Warrant for a Third Person Was Unlawful**

The Court must consider two issues before concluding whether the Special Agent DeProsperis' entry into the backyard was lawful: (1) whether the defendants have a reasonable expectation of privacy in the backyard because it is part of the constitutionally protected curtilage [14] of their first floor apartment, and (2) whether Special Agent DeProsperis' entry into the back-

---

**14.** "The word curtilage is derived from the Latin cohors (a place enclosed around a yard) and the old French cortilliage or courtillage which today has been corrupted into courtyard. Originally it referred to the land and outbuildings immediately adjacent to a castle that were in turn surrounded by a high stone wall ... Today its meaning has been expanded to include any land or building immediately adjacent to a dwelling. Usually it is enclosed some way by fence or shrubs." *United States v. Romano*, 388 F.Supp. 101, 104 n. 4 (E.D.Pa.1975) (parenthetical language in the original) (citations omitted).

yard, in the absence of exigent circumstances and a search warrant for defendants' apartment, in order to execute an arrest warrant for Carlos Santiago was lawful.

**(a) The Defendants Have a Reasonable Expectation of Privacy in the Backyard Because The Backyard is Part of the Constitutionally Protected Curtilage of Defendants' First Floor Apartment**

■ The Supreme Court has set out a two-part test for cases that require an analysis of an individuals expectation of privacy:

> The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J. concurring). *Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable? See *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

*California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986).

■ Applying these inquiries to the facts of this case the Court concludes that the fact that Jose Acosta and Martha Ovalle rented the first floor apartment, (Gov.'s Memo. in Support of Government's Opposition to Defendants' Motions to Suppress Evidence, at 5.), is enough to establish that they had a subjective expectation of privacy in their first floor apartment, which society recognizes as reasonable. *Cf. Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961)

("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.") (citation omitted); *Holland*, 755 F.2d at 255 ([T]he Supreme Court has accorded apartments and hotel rooms status as "homes" for Fourth Amendment purposes ...").

The Court further finds that Manual Acosta was an overnight guest [15] which is sufficient to establish he had a subjective expectation of privacy in Jose Acosta's and Martha Ovalle's first floor apartment, which society recognizes as reasonable. *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 1688, 109 L.Ed.2d 85 (1990) ("We need go no further than to conclude, as we do, that Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.").

Having concluded that all three defendants had a reasonable expectation of privacy in the first floor apartment, the Court is faced with the issue of whether the backyard is part of the curtilage of the first floor apartment and therefore entitled to the same protection given to the apartment by the Fourth Amendment. *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987) ("[T]he Fourth Amendment protects the curtilage of a house and ... the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.") (citation omitted).

The Court in *Dunn* set forth a methodology for determining if an area is within the curtilage of a home:

---

**15.** The circumstantial evidence establishes that all three defendants had spent the night in the first floor apartment. The evidence indicates: (1) Special Agent Allen entered the apartment at around 6:00 A.M., (Tr., October 25, 1991, at 40–41; Ex. D–1, at ¶ 3); (2) Manual Acosta was standing near the bathroom, (Tr., October 25, 1991, at 80), wearing underwear or cutoff shorts, (Tr., October 25, 1991, at 177), when Special Agent Allen entered the apartment; (3) Martha Ovalle was in her underclothes sitting on the bed when Special Agent Allen entered the

apartment, (Tr., October 25, 1991, at 131, 81, & 177); (4) Jose Acosta was in his underwear when Special Agent Allen entered the apartment, (Tr., October 25, 1991, at 177); and (5) all three defendants told Special Agent Marrero that they had been in the apartment "overnight". (Tr., October, 25, 1991, at 145.)

The Court also notes that the government never raised the issue of Manuel Acosta's standing to challenge the search of the first floor apartment.

we believe that curtilage questions should be resolved with particular reference to four factors: [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by ... [T]hese factors are useful analytical tools only to the degree that, in the given case, they bear upon the centrally relevant question—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection.

*Dunn,* 480 U.S. at 301, 107 S.Ct. at 1139 (bracketed numbers were added) (citations omitted).

Applying *Dunn*'s four factors, it is clear that the apartment's backyard is within the curtilage of the defendants' first floor apartment. *Dunn*'s first factor—"the proximity of the area claimed to be curtilage to the home"—argues for inclusion of the backyard in the "curtilage". The yard is in close proximity to the defendants' apartment. In fact, the backyard abuts two sides of the defendants' first floor apartment, (Ex. G–5 & G–6), and can only be entered from the apartment building through a door in the defendants' apartment. (Ex. G–6; Tr., October 25, 1991, at 164.)

*Dunn*'s second factor—"whether the area is included within an enclosure surrounding the home"—argues for inclusion of the backyard in the "curtilage". The backyard in question is completely enclosed.[16] (Ex. G–5 & G–6.)

*Dunn*'s third factor—"the nature and uses to which the area is put"—argues for inclusion of the backyard in the "curtilage". The evidence establishes that the backyard was not a common area. The backyard was partially removed from the street and fully enclosed. (Ex. G–6; Tr., December 13, 1991, at 21); *Cf. Fixel v. Wainwright,* 492 F.2d 480, 484 (5th Cir. 1974). As stated above, the only access into the backyard from the apartment building was through a door in the defendants' first floor apartment. (Ex. G–6; Tr., October 25, 1991, at 164.) None of the other tenants in the building were allowed to use the backyard. (Tr., December 13, 1991, at 32.) The backyard was used by the defendants for things such as barbecuing and taking out the trash, (Tr., December 13, 1991, at 33 & 23). Although the landlord had access to the backyard and used the backyard to store his boat and some scaffolding, (Tr., December 13, 1991, at 21), the landlord never entered or used the backyard early in the morning, (Tr., December 13, 1991, at 33–34), the time of the day at which Special Agent DeProsper-is entered it. (Ex. D–1; Tr., December 13, 1991, at 42–43.)[17]

There is no evidence that the backyard was used as a "common passageway normally used by the buildings tenants for gaining access to the apartments", nor evidence that it was "an area open as a corridor to salesman or other businessmen who might approach the tenants in the course of their trade." *Fixel,* 492 F.2d at 484. Although the defendants' backyard was not "as exclusive as the backyard of a purely private residence", it was "not as public or shared as the corridors, yards or other

---

**16.** The backyard is enclosed by six foot high cyclone fencing on the Randolph Street side of the building, six foot high cyclone fencing along the two foot two inch walkway which runs between 522 West Venango Street and the neighboring building on Venango Street, the walls of 522 West Venango Street, an eight foot high concrete block wall, and the walls of the neighboring building on Randolph Street. (Ex. G–6.)

**17.** The evidence also establishes: (1) the only gate in the fence was locked, (Tr. December 13,

1991, at 31–32); (2) although the defendants did not possess a key to the gate, neither did the landlord, because the key had been lost (Tr., December 13, 1991, at 24); (3) Jose Acosta knew how to open the gate by removing the hinges from the gate, (Tr., December 13, 1991, at 32); (4) there was nothing in Jose Acosta's and Martha Ovalle's lease which mentioned the backyard, (Tr., December 13, 1991, at 26); (5) children sometimes trespassed in the backyard, (Tr., December 13, 1991, at 22); and (6) there were piles of trash in the backyard, (Ex. G–5).

common areas of a large apartment complex or motel." *Fixel,* 492 F.2d at 484.

On the basis of all the evidence the Court concludes that the backyard is not properly characterized as a common area but rather should be characterized as defendants' backyard which was used by the defendants for domestic purposes. The backyard was "sufficiently removed and private in character that ... [the defendants] could reasonably expect privacy." *Cf. Fixel v. Wainwright,* 492 F.2d 480, 484 (5th Cir. 1974); *see also United States v. Romano,* 388 F.Supp. 101, 104–5 n. 6 (E.D.Pa.1975).

*Dunn*'s fourth factor—"the steps taken by the resident to protect the area from observation by people passing by"—is inapplicable to this case because tenants take the premises they lease as they find them and usually are not permitted to alter them in any significant way without the landlord's permission. The relevant inquiry is whether the landlord took any steps to protect the area from observation. In this regard, evidence indicates that: (1) the backyard was fully enclosed (Ex. G–6; Tr., December 13, 1991, at 21), and (2) even though the cyclone fencing on the Randolph Street side of 522 West Venango Street can easily be seen through, the configuration of the building and the fencing made it impossible to see the bathroom window from the Randolph Street side of the building without entering the backyard, (Ex. G–5, G–5A & G–6). The fact that it is possible for one to see parts of the backyard from various vantage points [18] is not determinative. *Cf. United States v. Boger,* 755 F.Supp. 333, 338 (E.D.Wash.1990) (area that was protected from observation on only three sides held to be part of the constitutionally protected curtilage of defendant's suburban home under *Dunn*'s four factors).

In considering the *Dunn* factors in light of the "centrally relevant consideration—

whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection", *Dunn,* 480 U.S. at 301, 107 S.Ct. at 1140, the Court finds that the backyard in question should be considered part of the curtilage of defendants' first floor apartment.

**(b) Special Agent DeProsperis's Entry into the Backyard in an Effort to Execute an Arrest Warrant for a Third Person was Unlawful**

■ Having concluded the backyard is within the curtilage of defendants' first floor apartment, the Court must address the issue of whether Special Agent DeProsperis's entry into the curtilage of the defendants' apartment was lawful. Because Special Agent DeProsperis's entry was warrantless and occurred before the exigent circumstances arose, the issue becomes whether his entry in order to execute a arrest warrant for a third person, Carlos Santiago, was unlawful.

The evidence indicates that: (1) after arriving at 522 West Venango Street, the address at which the Team believed Carlos Santiago resided, the Team realized that it was not a single family residence, rather it was a apartment building with several separately secured apartments, (Ex. D–1; Tr., October 25, 1991, at 67), and (2) the Team thereupon decided to knock and announce themselves at the entrance of each residence starting with the first floor apartment and working their way up through the three floors of the building. (Ex. D–1, at ¶ 3; Tr., October 25, 1991, at 67.)

The Court finds that this evidence shows that the police did not know in which apartment Carlos Santiago lived and therefore could not have had a reasonable belief that Carlos Santiago resided in the first floor apartment or that he was inside that apartment when they entered the backyard. As a result, the Court concludes that the legal-

---

**18.** The evidence indicates: (1) the six foot high cyclone fencing that surrounds part of the backyard can easily be seen through, (Ex. G–5 & G–6); (2) the bathroom window is visible from the two foot two inch walkway that runs between 522 West Venango Street and the neighboring building on Venango street, (Ex. G–5 & G–6.);

and (3) the rear portion of the yard at 522 West Venango Street, just outside of defendants' bathroom window, is visible from the yard area of the neighboring building, from the windows of the neighboring building, and from the windows of the second and third floor apartments at 522 West Venango Street. (Ex. G–5 & G–6.)

ity of Special Agent DeProsperis' entry into the backyard should not be analyzed by reference to the Supreme Court decision in *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), but rather should be analyzed under its decision in *Steagald v. United States*, 451 U.S. 204, 205, 101 S.Ct. 1642, 1644, 68 L.Ed.2d 38 (1981). *See* 2 Wayne LaFave, *Searches and Seizures*, § 6.1(b) at 578–79 ("With *Payton* requiring an *arrest* warrant for 'entry into a suspect's home' to arrest and *Steagald* requiring a *search* warrant where the arrest entry is of 'the home of a third party,' doubtless there will sometimes arise a question of which situation obtains in a particular case … [T]he matter to be decided is whether the entering officers reasonably believed that the place entered was the residence of the person named in the arrest warrant …") (footnote omitted).

The Court therefore concludes that the Team's entry into the backyard—the curtilage of defendants' first floor apartment—pursuant to an arrest warrant for Carlos Santiago and without a search warrant for defendants' apartment violated the Fourth Amendment rights of the defendants and therefore was unlawful.[19] *Steagald v. United States*, 451 U.S. at 205, 101 S.Ct. at 1644 ("The issue in this case is whether, under the Fourth Amendment, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant. [We conclude] … that a search warrant must be obtained absent exigent circumstances or consent …"). Special Agent DeProsperis' unlawful entry into the backyard of defendants' apartment impermissibly created the exigent circumstances which would otherwise have justified the Team's warrantless entry and search of defendants' apartment.

The government has therefore failed to meet its burden of proving it has satisfied the requirements of the exigent circumstance exception to the warrant requirement of the Fourth Amendment. As a result, all of the evidence seized in its initial protective "sweep" of the apartment and from outside defendants' bathroom window must be suppressed.

C. The Evidence Seized From Outside the Defendants' Window was Neither Abandoned Nor Lawfully Seized Pursuant to the Plain View Exception to the Warrant Requirement of the Fourth Amendment

 The plain view exception to the warrant requirement of the Fourth Amendment has three requirements: (1) that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) that the incriminating character of the evidence viewed must be immediately apparent; and (3) that the officer have a lawful right or access to the object itself. *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). The Court has already concluded that the backyard was the curtilage of defendants' first floor apartment and that Special Agent DeProsperis's entry into the defendants' backyard was unlawful. In other words, Special Agent DeProsperis was not lawfully in the backyard when he saw the evidence being thrown out of the defendants' bathroom window nor did he have a lawful right of access to the defendants' backyard or to the contents of that backyard. Therefore the Court finds that the first and third requirements of the plain view exception have not been satisfied.

 In order to determine whether the defendants voluntarily abandoned the

---

**19.** The government neither produced evidence nor argued that Special Agent DeProsperis entered the backyard on the mistaken assumption that it was a common area. Had the government done so, the Court would have considered applying the good faith exception to his entry into the backyard. *Cf. Maryland v. Garrison*, 480 U.S. 79, 88, 107 S.Ct. 1013, 1018, 94 L.Ed.2d 72 (1987) (search of the wrong apartment pursuant to an overly broad search warrant upheld because, *inter alia*, the officers' mistake in exe-

cuting the warrant was "objectively understandable and reasonable"); *United States v. Leon,* 468 U.S. 897, 918–19, 104 S.Ct. 3405, 3418, 82 L.Ed.2d 677 (1984) ("[E]ven assuming that the [exclusionary] rule effectively deters some police conduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter *objectively reasonable* law enforcement activity.") (emphasis added).

items the Team seized from outside the defendants' bathroom window the Court must ascertain whether the defendants surrendered a reasonable privacy interest in their property by moving it from their apartment into the backyard of 522 West Venango Street. *See United States v. Nordling*, 804 F.2d 1466 (9th Cir.1986) ("We have recognized that abandonment is a question of intent. The inquiry should focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search and seizure.") (citation omitted).

As the Supreme Court has stated:

the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.

*Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (citations omitted). Because the Court has already concluded that the defendants have a reasonable expectation of privacy in their apartment and the backyard, the "invaded place", the Court cannot find that the defendants intended to abandon items they threw from their apartment into the secured backyard of their apartment.

**D. The Fruit of the Team's Unlawful Conduct, Including the Evidence Seized Pursuant to the Execution of July 25, 1991, Search Warrant, Shall Be Suppressed**

■ Having concluded that the Team's entry and search of defendants' apartment on July 23, 1991 was unlawful, the Court finds that the evidence seized pursuant to the execution of the July 25, 1991 search warrant, which was issued based on probable cause resulting from the initial unlawful warrantless entry and search of defendants' apartment and backyard, is properly characterized as the "fruit" of the Team's

illegal conduct in entering and searching the defendants' apartment without a warrant. In addition, the Court finds that the Team members' observations of the defendants and the apartment and any statements taken from the defendants subsequent to the Team's illegal entry and search of defendants' apartment, on July 23, 1991, are also properly characterized as the "fruit" of the Team's illegal conduct. *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984) ("the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search ... but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree' ... It 'extends as well to the indirect as the direct products' of unconstitutional conduct").

Once the Court has concluded that the evidence is the fruit of illegal conduct, the issue before the Court becomes, "whether the challenged evidence was ' "come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint." ' ... In short, ... 'the exclusionary rule has no application [where] the Government learned of the evidence "from an independent source." ' " *Segura*, 468 U.S. at 804–5, 104 S.Ct. at 3385 (emphasis and bracketed material in the original) (citations omitted).[20] The government has neither argued nor presented any evidence that they had an independent source for any of this evidence. The Court therefore finds that suppression of the fruit of the government's unlawful conduct is justified.

### IV. CONCLUSION

For the above stated reasons, the Court holds that: (1) exigent circumstances were present, (2) the exigent circumstances were impermissibly created by the law enforcement officers because of the unlawful entry into the defendants' backyard but not

**20.** The Supreme Court has also allowed evidence to be introduced, when it is the result of unlawful government conduct, "[i]f the prosecution can establish by the preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). However, the government has neither argued nor presented any evidence that the "fruit" would have been discovered inevitably.

by their entry into the common hallway or their method of knocking and announcing themselves, (3) the evidence seized from outside the defendants' bathroom window was neither abandoned nor lawfully seized pursuant to the plain view exception to the warrant requirement of the Fourth Amendment; and (4) the fruit of the Team's unlawful conduct, including the evidence seized pursuant to the execution of the July 25, 1991, search warrant for defendants' apartment, shall be suppressed.

Accordingly, defendants' suppression motions will be granted and the following evidence will be suppressed: (1) the physical evidence found in the defendants' apartment and outside the bathroom window in the backyard of the defendants' apartment, and (2) evidence of the Team members' observations of the defendants and the apartment, and any statements taken from the defendants subsequent to the Team's illegal entry and search of defendants' apartment, on July 23, 1991.

