**UNITED STATES of America,
Plaintiff,**

v.

**Jason Von RADFORD, Defendant.**

No. Crim.A. 99–50049.

United States District Court,
E.D. Michigan,
Southern Division.

July 17, 2000.

Richard J. Amberg, Jr., Waterford, MI, Kenneth R. Sasse, Flint, MI, David W. Wright, Bloomfield Hills, MI, for defendant.

James C. Mitchell, U.S. Atty's Office, Bay City, MI, for U.S.

*OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS*

GADOLA, District Judge.

Presently before the Court is defendant Jason Von Radford's motion to suppress evidence and statements. Said motion was filed on June 28, 2000. The government responded to defendant's motion on June 29, 2000. On July 13, 2000, an evidentiary hearing on defendant's motion was conducted, the Honorable Paul V. Gadola, presiding.

For the reasons set forth below, the Court shall **GRANT** defendant's motion to suppress evidence and statements.

## I. FACTUAL BACKGROUND

During the evidentiary hearing on July 13, 2000, the government presented testimony of the following five witnesses: (1) Sgt. Alan R. McLeod; (2) Sgt. Mark Blough; (3) Officer Tracy Bird; (4) Sgt. Richard Hetherington; and (5) Officer Karl Petrich. Defendant did not testify nor present any defense witnesses. The Court will make clear, in the discussion below, the stark inconsistencies revealed by the testimony of the various government witnesses.

. On February 6, 1998, Flint police officers observed one Talmadge Butler pull into the driveway of a residence located at 2002 Proctor, Flint, Michigan. Mr. Butler was driving a 1988 blue Cadillac. The vehicle had been followed to that residence as part of the investigation and surveillance of suspected drug traffickers in the City of Flint area.

At approximately 11:36 a.m., Butler, the sole occupant, exited the vehicle and entered the residence. He was observed to be empty-handed. Shortly thereafter, at 11:42 a.m., Butler left the residence and returned to the vehicle. At this point, there is disagreement as to what, if anything, was seen in Butler's hands.

Sgt. McLeod, who was not at the scene, was listening to the police radio when Butler exited the residence. According to the sergeant, Officer Petrich, who was watching the residence, stated over the radio that Butler exited the residence carrying

"something." However, this allegation was flatly contradicted by the testimony of Officer Petrich at the evidentiary hearing. According to Petrich, he *never* saw Butler carrying anything out of the house.

After exiting the residence, it is uncontested that Butler reached into his vehicle, opened the hood and began "messing around" in the area where the battery would usually be found. After a few seconds, Butler closed the hood, re-entered the car, and proceeded to leave the scene.

Sgt. McLeod further testified that Officer Petrich also reported over the radio that the suspect, later identified as Butler, placed a "brown paper bag" under the hood of the blue Cadillac. Again, at the hearing Officer Petrich vehemently denied that he ever saw Butler place anything under the hood of the car. Instead, Officer Petrich testified that Butler was simply "messing around" in the area where the battery would usually be found.[1]

After Butler drove away from the residence, a marked Flint police car was asked to intercept the Cadillac and perform a vehicle stop. However, Butler refused to stop and led officers on a short chase which ended when Butler rammed two police cars in an attempt to flee the scene. Butler was arrested. Officer Randolph Tolbert opened the hood of the Cadillac and found a brown paper sandwich bag behind the left front headlight. The bag contained approximately 90 grams of crack cocaine.

Shortly after Butler was apprehended, at approximately 12:00 p.m. (noon), the police officers at the residence observed defendant Jason Von Radford exit the house in the company of his four year-old son. Defendant entered his car, started it, and was preparing to leave the driveway of the residence when officers, with guns drawn, ordered defendant to exit the vehicle. Defendant was handcuffed and detained. At this juncture, according to Sgt. McLeod's testimony, the officers had no specific information that defendant was involved in any criminal activity.

At 12:05 p.m., Sgt. McLeod and Officer Villareal knocked on the front door of the residence located at 2002 Proctor. Defendant was with them on the front porch when they knocked on the door. At the evidentiary hearing, Sgt. McLeod stated that he heard "running footsteps" inside the residence. Sgt. McLeod allegedly turned to defendant and asked whether there was anyone inside the residence. According to the sergeant, defendant responded, "Yes, and he [meaning the individual inside] should open the door." Sgt. McLeod testified that defendant never *consented* to the officers' entry into the residence. Sgt. McLeod further testified that because of the "running steps" he feared loss of evidence and decided to kick in the door.

Once inside the residence the officers found one Thomas Jefferson Atkins and his young son. Defendant was taken inside the residence. No *Miranda* warnings were provided to defendant at this time. Nor were they provided until approximately five hours later after defendant had been transported to the police station. During the time he was handcuffed and detained inside the residence, defendant told officers the location of crack cocaine, wrapping material, two digital scales, and

---

1. Sgt. Mark Blough testified that at approximately 11:42 a.m. on the day in question he was also listening to police radio transmissions. According to Sgt. Blough, someone stated over the radio that the suspect (i.e., Butler) had apparently put something under the hood of a vehicle. Sgt. Blough could not recall what the speaker's exact words were. Nor could Sgt. Blough recollect hearing mention of a "brown paper bag" or that the suspect had something in his hands upon exiting the residence. This testimony is consistent with Sgt. Hetherington's testimony. In contrast, however, Officer Tracy Bird testified that she also heard someone over the radio, presumably Officer Petrich, state that the suspect had "something" in his hands upon exiting the residence, that it was a "brown paper bag," and that the hood was opened by the suspect.

firearms inside the house. Defendant also apparently made inculpatory statements.

According to the testimony of Officer Bird, defendant was very concerned that the cocaine recovered would be attributed to Mr. Atkins, the other occupant found inside the residence. In light of this concern, Defendant allegedly volunteered that the cocaine was his. Officer Bird testified that no questions were asked by the officers prompting this statement, although the officer admitted that she had engaged in a conversation with defendant.

At this juncture, Sgt. McLeod left the residence in order to obtain a search warrant. Sgt. McLeod testified that when he returned to police headquarters and began preparing the affidavit in support of search warrant, he telephoned Officer Petrich at the 2002 Proctor residence to ask him questions about what he had observed that day. *See* Affidavit and Application for Search Warrant, attached as Exh. D to Defendant's Brief. Officer Petrich took the call in the upstairs bedroom of defendant's residence.

Concerning their conversation, Sgt. McLeod maintains that Petrich initially stated that he did not see the brown paper bag when Butler exited the house, but that he had seen "something." McLeod further maintains that Petrich, however, stated that he did see Butler place a bag under the hood of his car prior to leaving the scene. According to McLeod, from these statements the sergeant made an "assumption" or "conclusion" that Petrich had observed the bag in Butler's hands immediately upon exiting the residence. This "assumption" was the basis for his affidavit statement that "Officer Petrich observed Talmadge Butler exit the ... west front door of 2002 Proctor carrying a brown paper bag." *See* Affidavit and Application for Search Warrant, ¶ 8.

Sgt. McLeod's version of their conversation is completely at odds with Officer Petrich's testimony. Petrich testified that he told Sgt. McLeod on the telephone that he had seen Butler messing around under the hood, close the hood and then drive away. According to Petrich, as mentioned above, Petrich *never* saw Butler carrying "something" out of the house. Petrich testified that he also did not see the suspect put anything in the car. According to Petrich, during their conversation Sgt. McLeod indicated that he would state in his affidavit in support of search warrant that Officer Petrich *had* observed the brown paper bag so that they could "get into the house." *See* Report of Sgt. Richard D. Hetherington, attached as Exh. A to Defendant's Brief.

Immediately after their conversation, Officer Petrich testified that he approached Sgt. Hetherington to seek his advice. *See id.* Sgt. Hetherington later prepared a report concerning what Petrich told him regarding the telephone conversation with Sgt. McLeod. Officer Petrich was concerned because Sgt. McLeod apparently was going to make false statements in his affidavit. The following language contained in Sgt. Hetherington's report summarizes the telephone conversation between Petrich and McLeod:

> Ofc. Petrich ... indicated that Sgt. McLeod inquired whether or not Ofc. Petrich observed a "brown paper bag" when Butler was exiting the residence [2002 Proctor], and messing around under the hood. *Ofc. Petrich stated that he replied that he did not.* Ofc. Petrich advised that Sgt. McLeod then stated that the affidavit would indicate that Ofc. Petrich "had" observed the brown paper bag, so that we could "get into the house."

Exh. A to Defendant's Brief, p. 2 (emphasis added). Sgt. Hetherington's testimony at the evidentiary hearing fully supports the statements made in his report.

Based on the affidavit containing Officer Petrich's alleged observations, Sgt. McLeod obtained a search warrant for 2002 Proctor, Flint, Michigan. *See* Exh. C attached to Defendant's Brief. The warrant was executed between 3:20 and 3:25

in the afternoon of February 6, 1998. The search lasted approximately two hours. During the search, Officer Bird located approximately 200 grams of cocaine, in both crack and powder form, hidden in a dog food bag, as well as another firearm.

At approximately 4:58 p.m., defendant was provided with *Miranda* warnings after being transported from the residence to the Flint police station. According to Sgt. McLeod, at that time defendant stated that he wanted an attorney. Sgt. McLeod then testified that even though defendant had asked for an attorney and no interrogation occurred, defendant thereafter blurted out that "all the stuff in the house is mine."

As a result of the execution of the search warrant, and the evidence obtained from the residence, defendant was initially charged in state court with possession of cocaine with intent to deliver. However, that case was dismissed prior to defendant's preliminary examination. The 68th District Court, Genessee County, State of Michigan, issued an order on February 22, 1999. The order stated, *inter alia*, that

> ... the allegation that an officer [Petrich] made a[n] observation of a party leaving with a bag in his hand *was not in fact true* and the Court having reviewed the totality of the circumstances and contents of the affidavit for the search warrant and having determined that absent said allegation that the search warrant was improvidently issued on a mistaken allegation of facts ... the Complaint herein is hereby dismissed.

Order Dismissing Complaint, filed Feb. 22, 1999, p. 1 (attached as Exh. B to Defendant's Brief) (emphasis added).

## II. PROCEDURAL HISTORY

On May 26, 1999, the government filed a one-count indictment against defendant Jason Von Radford. Count I charged defendant with possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). The indictment alleged that defendant possessed with the intent to distribute 50 grams or more of crack cocaine.

On the same date, May 26, 1999, the government filed an *amended* indictment, also containing one count charging defendant with possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). However, the amended indictment, unlike the original, did not contain any reference to the drug amount.

On July 6, 1999, the court appointed Attorney David W. Wright to represent defendant. Mr. Wright filed no pre-trial motions whatsoever. On August 16, 1999, a jury trial was commenced.

On Day Two of the trial, defendant, through his counsel, Mr. Wright, advised the Court that he wished to plead guilty to the original indictment. On August 17, 1999, the Court took defendant's guilty plea on Count I of the original indictment.

On January 11, 2000, the parties appeared before the Court for the purpose of sentencing the defendant. At that time, David W. Wright, then counsel for defendant, made a motion for adjournment of sentencing and to be allowed to withdraw. For the reasons stated on the record in open court, the motion was granted and sentencing was adjourned.

On February 9, 2000, the Court appointed Richard J. Amberg, Jr. to represent defendant. On April 17, 2000, new counsel for defendant filed a motion to withdraw guilty plea and to dismiss based upon prior counsel's inadequate assistance. The government responded to the motion on April 18, 2000.

On June 7, 2000, the Court conducted a hearing concerning defendant's motion to withdraw guilty plea and to dismiss. At the hearing, counsel for defendant withdrew the motion to dismiss and indicated that he desired to submit a motion to suppress evidence and statements. The Court *granted* defendant's motion to withdraw guilty plea and allowed defendant to submit a motion to suppress. *See* Order issued June 7, 2000.

As stated above, defendant filed a motion to suppress evidence and statements on June 28, 2000. The government responded to said motion on June 29, 2000. On July 13, 2000, this Court held an evidentiary hearing on defendant's motion.

## III. LEGAL STANDARDS

■ The Fourth Amendment protects individuals against unreasonable searches and seizures by governmental agents, guaranteeing the right of the people "to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV.[2] The Fourth Amendment is made applicable to the states via the Fourteenth Amendment's due process clause. *See Terry v. Ohio,* 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In applying the Amendment, courts have carved out special protection for an individual's home, such that warrantless entry by governmental actors will be considered presumptively unreasonable. *See Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

In *Payton,* the United States Supreme Court considered the constitutionality of New York state statutes, authorizing police officers to enter a private residence without a warrant in order to make a routine felony arrest. *See* 445 U.S. at 573, 100 S.Ct. 1371. In deciding the issue, the Court reiterated the long held view that " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Id.* at 585, 100 S.Ct. 1371 (citing *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). In striking down the unconstitutional statutes, the Court relied upon the following rationale:

[t]o be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.

*Id.* at 588–89 n. 28, 100 S.Ct. 1371 (quoting *United States v. Reed,* 572 F.2d 412, 423, *cert. denied, sub nom. Goldsmith v. United States,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978) (internal quotes omitted)). Additionally, the Supreme Court distinguished searches and seizures occurring inside a home from those conducted in public: "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586, 100 S.Ct. 1371.

This presumption of unreasonableness may be rebutted, however, by a showing that a specific exception to the warrant requirement applies in the particular case under consideration. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). An exception to the warrant requirement may exist where "exigent circumstances" are found or where the suspect gives his voluntary consent to conduct the search. *See, e.g., Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

■ If, as in the instant case, a search warrant has been issued, the reviewing court must also assess whether probable cause to search existed in light of the "totality of circumstances." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause to search has been defined as a "fair proba-

**2.** The Fourth Amendment provides in full as follows:
[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV.

bility" that contraband or other evidence of a crime will be found at the place to be searched. *See id.* "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

## IV. ANALYSIS

Defendant's motion to suppress implicates the following issues: (1) the validity of the officers' initial entry into the residence located at 2002 Proctor, Flint, Michigan; (2) the validity of the search warrant based upon Sgt. McLeod's affidavit; and (3) the admissibility of defendant's statements to police officers after being detained and transported into the residence. Each of these issues shall be considered *seriatim.*

## A. THE VALIDITY OF THE INITIAL ENTRY

As a threshold issue, the Court must first determine whether the police officers' *initial* entry into the residence was violative of the Fourth Amendment. According to the government, Sgt. McLeod entered the residence after hearing sounds of "running footsteps" inside. The following description of events is found in the government's responsive brief:

> . . . at 12:05 p.m., Sgt. McLeod and Officer Villareal arrived and knocked on the front door of 2002 Proctor. Sgt. McLeod could hear someone run across the living room and up the stairs inside. Sgt. McLeod again knocked on the front door several times and still received no answer. Sgt. McLeod then turned to defendant Jason Von Radford and asked him if anyone was inside. [Defendant] stated that there was and that he should open the door. Fearing the loss of evi-

dence, the door was forced and residence secured.

Govt's Brief in Response, pp. 1–2. Defendant's brief acknowledges that Sgt. McLeod "entered under the guise [of] securing the house after hearing the sound of running footsteps." Defendant's Brief, p. 7.

At the evidentiary hearing, Sgt. McLeod confirmed that he and another officer approached the door of the residence with the defendant. As mentioned previously, Sgt. McLeod turned to defendant and asked whether there was anyone inside the residence. According to the sergeant, defendant responded, "Yes, and he [meaning the individual inside] should open the door." Sgt. McLeod testified that defendant never *consented* to the officers' entry into the residence. Sgt. McLeod further testified that he heard "running steps" inside and, fearing loss of evidence, kicked in the door.

Because it is clear that defendant did not consent to the officers' entry, the question becomes whether the sound of running footsteps is sufficient, in and of itself, to rebut the presumption of unreasonableness attendant to the warrantless entry of a home. It is well-settled that "exigent circumstances" exist when there is a compelling need for official action but no time to obtain a warrant. *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978). The government bears the burden of showing that exigent circumstances existed to justify a warrantless entry. *United States v. Talkington,* 843 F.2d 1041, 1044 (7th Cir.1988).

In the present case, the Court finds that the government has failed to satisfy its burden of demonstrating that "exigent circumstances" existed. The case law is clear that "running footsteps," in and of themselves, do *not* qualify as "exigent circumstances". *See United States v. Romero,* 967 F.Supp. 1093 (N.D.Ind. 1997) and *Walker v. United States,* 225 F.2d 447 (5th Cir.1955).

In *Romero*, the district court held that exigent. circumstances did not exist for warrantless entry into defendant's house based upon coconspirators' drug-related arrests at another location. In *Walker*, just as in the case at bar, the officers went to the entrance of the defendant's residence, "heard voices and footsteps behind the door," and then forced the door open. *Id.* at 1095. In reaching its decision to grant defendant's motion to suppress evidence, the court noted that "[t]he government presented no evidence as to why the agents did not attempt to obtain the warrant or that it would have been impossible to obtain such warrant in thirty minutes." *Id.* at 1097; *see United States v. Talkington*, 843 F.2d 1041, 1047 (7th Cir.1988) (holding that "it may not always be possible to obtain a telephonic warrant with sufficient speed. However, ... the government, in meeting its burden of showing exigent circumstances should demonstrate affirmatively that it was impractical to procure one"). The court further reasoned as follows:

> [o]nce the agents decided to enter [the defendant's] house, the fact that they heard voices and footsteps after they announced the presence of federal officers did not justify a warrantless entry. Law enforcement agents cannot create exigent circumstances by knocking on the door and announcing their presence. *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir.1974); *see also United States v. Thomas*, 893 F.2d 482, 488 (2nd Cir.1990).

*Id.* at 1097.

Similarly, in *Walker*, the Fifth Circuit held that officers' warrantless search of the defendant's barn was unreasonable. The officers' had suspected the barn of containing an illegal still. They approached within thirty feet of the barn and "noticed a black garden hose running from the barn, became aware of the odor of cooking mash, and heard a metallic thump and the sound of *running footsteps* inside the barn." *Id.* at 448 (emphasis added).

Based on these perceptions, the officers entered the barn where they found a still in operation. The court held that no exceptional circumstances were present to validate the warrantless entry. The court quoted with approval the following language from *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948):

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. *** When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

*Walker*, 225 F.2d at 450, n. 6.

At the hearing, counsel for the government argued that exigent circumstances did exist because the police officers not only heard running footsteps but also had probable cause to believe drugs were inside the residence. "[A] warrantless entry for some limited purposes is permissible if police officers have probable cause to search the residence *and* exigent circumstances are present." *U.S. v. Chavez*, 812 F.2d 1295, 1298 (10th Cir.1987) (emphasis added). While the officers may have had *suspicions* that drugs may have been present based upon the drugs found earlier in Butler's vehicle, the Court finds that their suspicions did *not* rise to the level of *probable cause*.

The testimony of the various officers at the evidentiary hearing was inconsistent. Officer Petrich himself, the only officer who actually, physically observed Butler leave the residence testified that he *never* observed Butler carrying anything. In contrast, Sgt. McLeod and Officer Bird claim to have heard Petrich state over the radio that "something" was in Butler's hands upon exiting the residence. Petrich's version of events is supported by the report of Sgt. Hetherington. In that report, Petrich relates his conversation with Sgt. McLeod, indicating that he told McLeod that he had *not* observed the brown paper bag. *See* Exh. A to Defendant's Brief, p. 2.

The Court finds Officer Petrich's testimony to be credible and reliable, especially in light of Sgt. Hetherington's report. In contrast, the Court has serious doubts about both the testimony of Sgt. McLeod and Officer Bird. Assuming that Officer Petrich is telling the truth, that he did *not* see Butler leave the house with anything in his hands, then Sgt. McLeod had no solid basis to connect the drugs found in Butler's car to the residence. The bag of cocaine could have originated from the interior of Butler's vehicle or Butler could merely have been checking under the hood to ensure the bag was still where he had earlier placed it. Sgt. McLeod certainly may have been justified in having *suspicions* about what drugs might be found in the residence but, given the lack of connection between the house and the drugs, no "probable cause" existed.

Based upon *Romero* and *Walker*, discussed *supra*, it is apparent that the officers' initial entry into the residence located at 2002 Proctor cannot be justified on the basis of "running footsteps" alone. Accordingly, the Court holds that the initial entry into the residence was unreasonable and in violation of the Fourth Amendment.

### B. THE VALIDITY OF THE SEARCH WARRANT

█ Even assuming *arguendo* that the officers' initial entry into the residence was

proper, the next question becomes whether the search warrant, based upon Sgt. McLeod's affidavit, was valid.

Defendant argues that Sgt. McLeod made false representations in the affidavit with regard to Officer Petrich's observation of the brown paper bag. This argument is expressly supported by the testimony of Officer Petrich. His testimony revealed that he did *not* observe a brown paper bag in Butler's hand at any time. As mentioned above, Sgt. McLeod allegedly stated to Officer Petrich that the affidavit would indicate (erroneously) that Petrich "had" observed the brown paper bag, so that we could "get into the house." Exh. A to Defendant's Brief.

In response, the government relies upon Sgt. McLeod's testimony that he recalls hearing police radio traffic at 11:42 a.m. on February 6, 1998, declaring that Talmadge Butler was exiting the front door of 2002 Proctor and had a brown paper bag in his hand upon opening the hood of his vehicle. *See* Govt's Brief in Response, p. 5. The government maintains that Sgt. McLeod "honestly believed" that the "brown bag" statement was made over the police channel. The government also alleges that Officer Petrich made "multiple statements" that he remembered seeing "something" in Butler's hand upon exiting the residence. The government further argues that even if Sgt. McLeod mistakenly identified the speaker who allegedly made the "brown paper bag" statement, this error would not defeat the search warrant pursuant to the "good faith exception" found in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

█ Pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), an evidentiary hearing is required in the event a defendant makes a preliminary showing that a false statement "knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and

if the allegedly false statement is necessary to the finding of probable cause, . . . ." *Id.* at 155–56, 98 S.Ct. 2674. As the Supreme Court further held,

> [i]n the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, *the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.*

*Id.* at 156, 98 S.Ct. 2674 (emphasis added).

Defendant, in the case at bar, has made such a preliminary showing. At the evidentiary hearing, Sgt. McLeod testified that he made a telephone call to Officer Petrich allegedly to confirm what the latter had observed. It is apparent, at least from the report of Sgt. Hetherington, that Officer Petrich did *not* observe Butler carrying a "brown paper bag" upon exiting the residence. Furthermore, Sgt. Hetherington's report critically damages the veracity of Sgt. McLeod's affidavit when it reports that Sgt. McLeod stated to Petrich that the affidavit would indicate that Ofc. Petrich "had" observed the brown paper bag so that the officers could "get into the house." If this is true, Sgt. McLeod made a false statement knowingly, intentionally, or with "reckless disregard for the truth."

Sgt. McLeod's explanation of his allegations in the affidavit strains credulity. According to Sgt. McLeod's testimony, he understood Officer Petrich to mean that Petrich had observed Butler carrying "something" after exiting the residence, and that, furthermore, Petrich had observed a "brown paper bag" being placed under hood of Butler's car. Since the bag was allegedly in Butler's hands before he placed it under the hood and since Petrich allegedly earlier had observed Butler with "something" in his hands, Sgt. McLeod "concluded" that Petrich had observed

Butler carrying the bag immediately upon exiting the residence.

At the hearing, the Court pointed out the problem with this explanation. If upon speaking with Officer Petrich on the telephone it became clear to the sergeant that the officer had not in actuality seen Butler carrying the bag immediately upon exiting the residence, the question remains why Sgt. McLeod did not take into account Officer Petrich's version of events when preparing the affidavit. Instead, Sgt. McLeod reported his "assumption" or "conclusion" as to what Officer Petrich actually saw.

The government argues that *even if* the Court were to find that the "brown paper bag" statement were false or made with "reckless disregard," the remaining affidavit would still be sufficient. *See* Govt's Response, p. 7 (citing *United States v. Campbell,* 878 F.2d 170 (6th Cir.), *cert. denied,* 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 194 (1989)). According to the government, probable cause may be established from the following facts: that Butler exited the house, opened the hood of his car, placed his hands in the front engine compartment, left the scene, was stopped after a short chase, and that 90 grams of cocaine were found under the hood. The government maintains that this chain of events leads to probable cause to believe that the crack cocaine found under the hood had come from the house in question.

As discussed at length *supra,* the Court finds that the misrepresentation in the affidavit is *crucial* to the probable cause determination. Even assuming *arguendo* that Officer Petrich had observed "something" in Butler's hands, as opposed to nothing as he claims, this "something" is too vague and nondescript to allow a reasonable person to conclude that Butler possessed a "brown paper bag" containing drugs upon exiting the residence. There was no probable cause to search defendant's residence because, in the absence of Petrich's alleged observations, there was simply not a sufficient *connection* between

the house and the drugs obtained from under the hood of Butler's vehicle.

■ Additionally, the Court holds that *Leon*'s "good faith exception" is *not* applicable given the reckless misrepresentations found in Sgt. McLeod's affidavit. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Pursuant to *Leon,* the "good faith exception" is *not* applicable and suppression remains an appropriate remedy "if the magistrate or judge in issuing a warrant was *misled* by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id.* at 923, 104 S.Ct. 3405 (emphasis added).

The instant case is analogous to *Franks v. Delaware* in light of Sgt. McLeod's false statements regarding the "brown paper bag." The Court is extremely troubled by the report of Sgt. Hetherington which supports Officer Petrich's contention that Sgt. McLeod misrepresented the officer's observations in McLeod's affidavit in order to "get into the house," i.e., to obtain a search warrant. In light of these considerations, *Leon*'s "good faith" exception would certainly not be applicable.

### C. DEFENDANT'S STATEMENTS TO POLICE OFFICERS AFTER BEING DETAINED AND TRANSPORTED INTO THE RESIDENCE

Defendant further argues that incriminating statements which were made by defendant during the first five hours of his detention were obtained by police in violation of his Fifth Amendment rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant also maintains that his initial detention and transport into the residence constituted an arrest without probable cause in violation of the Fourth Amendment. Defendant relies upon *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), for the proposition that police officers violate a suspect's

Fourth Amendment rights when they take him into custody without probable cause to arrest, transport him to another location, and then detain him for several hours.

In response, the government argues that the statements made by defendant were voluntary, spontaneous declarations and not the product of interrogation. *See United States v. Murphy,* 107 F.3d 1199 (6th Cir.1997); *United States v. Montano,* 613 F.2d 147 (6th Cir.1980). With respect to defendant's initial detention, the government argues that the Supreme Court has authorized the routine detention of "occupants" of a residence during the execution of a search warrant. *See Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). According to the government, the *Michigan v. Summers* rule has been extended to allow a resident detained off the premises to return to the premises to assist in the execution of the warrant so long as he is detained "as soon as practicable after departing . . . ." *United States v. Cochran,* 939 F.2d 337 (6th Cir.), *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1166, 117 L.Ed.2d 413 (1992). Finally, the government maintains that once the search results in discovery of drugs and firearms, agents have reasonable suspicion to detain the residents for further questioning pursuant to *United States v. Fountain,* 2 F.3d 656 (6th Cir.1993), *cert. denied,* 510 U.S. 1014, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993).

■ At the outset, the Court must determine whether defendant's initial detention outside the residence was proper. When the police officers approached defendant outside the residence, clearly there was reasonable suspicion sufficient for an investigative stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Pursuant to *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), once officers validly stop a suspect, they may permissibly seize evidence in plain view, and then arrest the

suspect if probable cause to arrest is found based upon the evidence seized.

 *However*, the instant case does *not* present a *Hensley*-situation. Defendant was stopped outside the residence with his four year-old son, and then transported back into the residence by police where he made incriminating statements. As discussed *supra*, defendant did not consent nor did any legitimate "exigent circumstances" exist justifying the entry of police officers into the residence. Accordingly, the officers' entry into the house was impermissible.

Furthermore, the government's reliance upon *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), and its progeny, is entirely misplaced. Those cases concern detention of residents *during* the execution of a valid search warrant. *However*, in the case at bar, as discussed, the warrant was not secured until *after* the officers had improperly entered the residence. Moreover, the subsequent search warrant was invalid because based upon a misleading affidavit.

 Since the Court has already determined that the initial entry by the officers as well as the subsequent search warrant were invalid, any statements made by defendant after his detention and transport into the residence must be suppressed. The seminal case concerning suppression in such cases is *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), wherein the "fruit of the poisonous tree" doctrine was first articulated. The Supreme Court in that case explained as follows:

> The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734, that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. *McGinnis v. United States*, 1 Cir., 227 F.2d 598. Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. *See Nueslein v. District of Columbia*, 73 App.D.C. 85, 115 F.2d 690. Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers, *Rea v. United States*, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233, or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction.

*Id.* at 484, 83 S.Ct. 407 (footnote omitted).

In *Wong Sun*, just as in the case at bar, the government argued that the defendant's statements to officers, "although closely consequent upon the invasion which we hold unlawful, were nevertheless admissible because they resulted from 'an intervening independent act of a free will.'" *Id.* at 486, 83 S.Ct. 407. The Supreme Court rejected this argument finding that under the circumstances in which defendant had been immediately handcuffed and arrested, it was "unreasonable to infer that [the defendant's] response was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.*[3] The Court must follow *Wong Sun* in

---

**3.** In a footnote, the *Wong Sun* Court stated that "[e]ven in the absence of ... oppressive

circumstances, and where an exclusionary rule rests principally on nonconstitutional

suppressing both the evidence and subsequent statements made by defendant after the initial unlawful entry.[4]

Additionally, the Court expresses its concern that defendant was not provided with *Miranda* warnings until 4:58 p.m. on the day in question, approximately *5 hours* following his arrest. Another troubling factor concerns the officers' actions subsequent to their initial entry into the residence. According to the testimony of Officer Petrich, the officer took the telephone call from Sgt. McLeod in the upstairs bedroom of the residence. This illustrates that officers were allowed to roam throughout the residence even *before* any search warrant was obtained. Instead of "securing" the residence prior to executing the search, it appears that officers were allowed free access to the house for several hours before any warrant was obtained.

In view of all the foregoing considerations, as well as the Court's strong suspicion of blatant police misconduct, including the making of false statements in a sworn affidavit and application for search warrant, all evidence and statements made by defendant following the officers' initial unlawful entry into the residence must be suppressed.

*ORDER*

**NOW, THEREFORE, IT IS HEREBY ORDERED** that defendant Jason Von Radford's motion to suppress evidence and statements, filed June 28, 2000, be **GRANTED.**

**SO ORDERED.**

---

grounds, we have sometimes refused to differentiate between voluntary and involuntary declarations." *Id.* at 486 n. 12, 83 S.Ct. 407 (citing Hogan and Snee, *The McNabb–Mallory Rule: Its Rise, Rationale and Rescue*, 47 Geo. L.J. 1, 26–27 (1958)). The Court proceeded to discuss "illustrative situations where a voluntary act of the accused has been held insufficient to cure the otherwise unlawful acquisition of evidence." *Id.* (citing *Bynum v. United States*, 262 F.2d 465 (C.A.D.C.1958) (holding inadmissible fingerprints made by defendant after unlawful arrest); *United States v. Watson*, 189 F.Supp. 776 (S.D.Ca.1960) (excluding narcotics voluntarily surrendered by accused in the course of an unauthorized search); *Takahashi v. United States*, 143 F.2d 118, 122 (9th Cir.1944) (holding that "all declarations and statements under the compulsion of the things so seized, are affected by the vice of primary illegality. . . .")).

4. Defendant also relies upon *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d

824 (1979). However, that case is not applicable to the facts presented herein. In *Dunaway*, the Supreme Court held that defendant was "seized" for Fourth Amendment purposes when he was arrested and taken to the police station for questioning. Defendant in the case at bar was not taken to a police station for questioning immediately following his detention. Instead, he was taken inside the residence. In *Dunaway*, the court reasoned that post-detention questioning without probable cause to arrest violated the defendant's Fifth Amendment due process rights. *See* 442 U.S. at 218–19, 99 S.Ct. 2248. Because defendant was not taken to a police station immediately after arrest and apparently was not subjected to interrogation, *Dunaway* is inapposite. It should be emphasized that this does not in any way prevent the suppression of evidence pursuant to the Supreme Court's decision in *Wong Sun, supra.*